## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **AXIS INSURANCE COMPANY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:16-cv-01021-JHE** |
| | ) | |
| **SHARANDA L. TERRY** | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| | ) | **MOTION IS OPPOSED** |
| **Defendant.** | ) | |

---

### MOTION FOR SUMMARY JUDGMENT, STATEMENT OF UNDISPUTED MATERIAL FACTS, AND MEMORANDUM OF LAW IN SUPPORT THEREOF

---

Comes now the Plaintiff, AXIS Insurance Company (hereinafter "AXIS" or "Plaintiff") and, pursuant to Rule 56 of the Fed.R.Civ.P., moves this Court for the entry of an order granting summary judgment in its favor as to all of Plaintiff's claims. In support of this Motion, Plaintiff relies upon the pleadings and the filings in this case, the following statement of undisputed material facts, and the evidentiary submissions being filed contemporaneously herewith.

## I.   STATEMENT OF UNDISPUTED MATERIAL FACTS

Being filed as Exhibit 1 is the Affidavit of Kristen Mandell, the Account Manager of Program Claims at AXIS Insurance Company in support of Motion for

Summary Judgment, along with Exhibits A through S, attached thereto.

On January 12, 2016, Ms. Sharanda Terry ("Ms. Terry," "Terry" or "Defendant") purchased the property located at 6730 2nd Avenue South, Birmingham, Alabama 35212 (hereinafter the Subject Property).  See Exhibit A to Exhibit 1.  The Settlement Statement for the purchase of the property, attached hereto as Exhibit B to Exhibit 1, shows Ms. Terry paid $8,500.00 as the purchase price for the property, plus other charges, bringing the total amount paid to $10,500.08.  Attached to Exhibit 1 as Exhibit C is a true and correct copy of the deed transferring the property to Ms. Terry on January 12, 2016.

On January 14, 2016, Ms. Terry submitted an application to acquire homeowners insurance for the Subject Property.  Exhibit A to Exhibit 1.  On the same date, a policy was issued to Ms. Terry (AXIS Policy No. 007759) with coverage limits of $91,000.00 for the dwelling and $36,400 for personal property.  Exhibit 1, Exhibits D and E. The insurance application signed by Ms. Terry included the following provision:

> Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof. 27-12A-20

See Exhibit A to Exhibit 1 at 4 – 6 (emphasis added).[1]

---

[1] Page numbers for Exhibits D and E are the efiling page numbers at the top of the pages.

The insurance policy contained the following relevant provisions:

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.  (Ex. E to Ex. 1 at 26).

...

**SECTION I - PROPERTY COVERAGES**

**A.    Coverage A - Dwelling**

1.    We cover:
a.    The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and
b.    Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".  (Id. at 28).

...

**C.    Coverage C - Personal Property**

**1.    Covered Property**

We cover personal property owned or used by an "insured" while on the "residence premises".  After a loss and at your request, we will cover personal property owned by others while the property is on the part of the "residence premises" occupied by an "insured".  (Id.)

...

**SECTION I - EXCLUSIONS**

We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of

any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area. (Id. at 33).
...
**8.      Intentional Loss**

Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss. In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.   (Id.)

**SECTION I - CONDITIONS**
...
**B.      Duties After Loss**

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either: (Id. at 34).
...
5.      Cooperate with us in the investigation of a claim; (Id.)
...
7.      As often as we reasonably require:
a.      Show the damaged property;
b.      Provide us with records and documents we request and permit us to make copies; and
c.      Submit to examination under oath, while not in the presence of another "insured", and sign the same; (Id.)
...

**Q.      Concealment or Fraud**

We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

1.    Intentionally concealed or misrepresented any
      material fact or circumstance;
2.    Engaged in fraudulent conduct; or
3.    Made false statements;
      relating to this insurance.

Exhibit E to Exhibit 1. (Id. at 36).

On Thursday, January 28, 2016, at approximately 12:46 a.m., the Birmingham Police Department ("BPD" or "Police Depart.") responded to a fire at the subject property. The BPD contacted the Birmingham Fire and Rescue Service ("BFRS" or "Fire Department"), and they also responded to the fire. Exhibit 28 to Exhibit 2, Deposition of Sharanda Terry (12/19/17) at 1. The fire was started at some time not long before 12:45 a.m. on January 28, 2016. The timeline for the BFRS is set forth on page 8 of Exhibit 2 to Exhibit 3 – the Deposition of Lieutenant Fitzgerald Moseley (12/21/17). The Report shows that the BFRS received the fire alarm at 12:45 a.m. on January 28, 2016. They arrived at the subject property at 12:48 a.m. on January 28, 2016.  This information is recorded and downloaded on tape contemporaneously as events occur. Exhibit 3 at 12-13. Captain Fitzgerald Moseley began his investigation at approximately 1:00 a.m.

Exhibit M to Exhibit 1 is Ms. Terry's Examination Under Oath (EUO) of April 19, 2016. Exhibit 12 to Exhibit M is Ms. Terry's copy of the police report with her handwriting on the first page.  Exhibit 12 to Exhibit M indicates that Ms. Terry told the police that she left the Subject Property at approximately 12:00

midnight immediately before the fire.  Ms. Terry now denies this.  However, she

also testified as follows about a discussion with her neighbor upon her arrival back

at the property on the night of the fire:

> Q.     Your neighbor called you at 12:55, and that's when you learned
> for the first time there was a fire?
> A.     Yes.      (Ex. M at 95).
> …
> Q.     And he saw you?
> A.     Yes.
> Q.     That's the person that maybe is saying whatever this is, him and
> his wife or something?
> A.     No, because it makes no sense to me.  How could somebody
> see smoke but not see flames if that was to happen?  So that's kind of
> stupid.  So I knew that was like – had no merit at all.
> Q.     What if there is –
> A.     <u>He told me when I pulled up that – he was like you had just
> been gone – you hadn't been gone a whole hour, something like that</u>.

Exhibit M at 96-97 (emphasis added).

Ms. Terry appears to adopt this statement. She does not refute it. <u>Id</u>.  If Ms.

Terry had not been gone a whole hour, then she would have left shortly after

midnight, according to this testimony.  That is consistent with the story that she left

the house at midnight, which she originally told the police and firemen. Ms. Terry

admits that she told the police that she had been at the house "45 minutes earlier."

<u>Id</u>. at 50.  Her testimony was: "yeah, somewhere forty-five to an hour before it

happened."  Exhibit N to Exhibit 1 at 50. This would have been about midnight.

6

The police officers spoke and she told them she had left the house at "around midnight" and believed she had left the heater on.  It was also reported by the Police: "[W]itness on scene, who wished to remain anonymous, stated that Ms. Terry had left just prior to the fire beginning."  Ex. 12 to Ex. N to Exhibit 1 – EUO of Sharanda Terry (5/24/17).  The Birmingham Police Department cannot force people to give information concerning their identities, according to Det. James Canino. Exhibit 4- Lt. James Depo. (12-21-17) at 31; see also Exhibit 2 to Exhibit 4 at 10 and 30.

In his report, Lt. Moseley determined that the cause of the fire was "incendiary under suspicious circumstances and was caused by human intervention." Exhibit 1 to Exhibit 3 – Deposition of Capt. Fitzgerald Moseley (12/21/17) at 4. He located a five-gallon gas can in the kitchen and a bottle of charcoal lighter fluid in the bedroom. Id. There was a .38 caliber revolver found with the handle taped.  Id. This was Ms. Terry's gun. Later, on January 28, 2016, the fire was reported to Tim Parkman, Inc. ("TPI"), a third-party claims administrator for AXIS.  The fire was then reported to AXIS and AXIS began its investigation of the claim.  Exhibit 1 at 7-8.

McDonald Claim Service, LLC ("McDonald") investigated the claim for AXIS on or about January 29, 2016, February 12, 2016 and March 28, 2016, it submitted three reports. See Exhibits G, H and J to Exhibit 1; Exhibit 1 pp 7-8. In

its first report, McDonald reported what Ms. Terry had initially told him stated that the insured had left the property at 11:30 p.m. on the night of the fire. A true and correct copy of McDonald's Initial Report of February 8, 2016, is attached to Exhibit 1 as Exhibit G. Exhibit G at 1-2. McDonald's Second Report and Third Reports are attached as Exhibits H and J to Exhibit 1.  In preparing his Second Report, McDonald also spoke to Fire Inspector Lieutenant Fitzgerald Moseley of the BFRS on February 11, 2016, and interviewed Ms. Terry.  Id.

Based upon his discussions with Moseley, McDonald learned that Ms. Terry had left the house at about midnight. McDonald then concluded that Ms. Terry had left the house before the fire and later than 11:30 p.m. on January 27, 2016. McDonald advised AXIS that it should wait to make a decision on the claim until after Moseley's report was complete. Exhibit J to Exhibit 1.  Ms. Terry told Jeff Starnes of G4S Compliance and Investigations that she had left the property at 11:00 p.m. that night.  Exhibit L to Exhibit 1 at 5.

During her Examination Under Oath (EUO) testimony Ms. Terry stated that she left the home about 11:15 or 11:20. Sharanda Terry EUO (4/19/16) at 71-73 attached to Exhibit 1 as Exhibit M.  Ms. Terry's testimony concerning the timeline of events on the night of the fire changed again later during her deposition testimony. Ms. Terry testified at her deposition that she left earlier than 11:15 to 11:20 and was "on the other side of town" from the subject property and near her

sister's house by Green Springs Avenue by 11:15 to 11:20 p.m. Exhibit 2 at 271.

Terry changed her story again in the same deposition and claimed that she left the house at 10:40 p.m., shortly after the 10:35 p.m. phone call with Phillip Taylor, her boyfriend. Id. at 308.

She also testified that it was approximately an hour to an hour and a half from the time she left before the fire until she got back after the fire. Id. at 309. Therefore, if she left the house at approximately 10:40 p.m. and was gone from one to one and one-half hours, she would have arrived back at the house from her trip to the Green Springs Avenue area at anywhere from 11:40 p.m. to 12:10 a.m. Given the amount of time she estimates she was gone, until she arrived back at the house, she would have had to have left the subject property before the fire between 11:35 p.m. and 12:05 a.m., given that she arrived back at the house at approximately 1:05 a.m. Id. at 307-309. Her own testimony does not support her timeline and makes it clear that Terry left the property before the fire at 11:35 p.m. to 12:05 a.m.

Ms. Terry claims she first went to her sister's house from the subject property after leaving it just before the fire. Ex. 2 at 272. Her sister's house is near the Greensprings Avenue and I-65 intersection. Ms. Terry sat in the car and did not go inside her sister's house. Id. She then went to the Chevron on 6th Avenue South to buy some gas. Id. at 272 and 276. She was at the Chevron station buying gas for

approximately ten minutes. She then drove by a friend's house near Arlington Mansion, which is a five to ten minute drive from the Chevron station. She did not go in. Terry claims that she then drove from near Arlington back to her sister's house. Id. at 279. She again just sat in the car and did not go inside her sister's house. As she was heading back to the Southside of Birmingham to look for Phillip Taylor, she received a call at 12:55 a.m. about the house fire from her neighbor, Frank McCoy, when she was at the entrance to I-65 North on Greensprings Avenue. Id. at 279-282.  The police had asked McCoy to contact the owner.  She then hurried back to the Subject Property and arrived there at 1:05 a.m. Exhibit M to Exhibit 1 at 106-107; see also id. at 74-107. The house was in flames when she arrived. Exhibit 2 at 285. Terry claims that it probably took her less than fifteen minutes to get back to the house after receiving the phone call from McCoy. Id. at 293; see also Exhibit M to Exhibit 1 at 71- 76 and 90- 94.  However, this time she testified that she did not know what time it was when she drove back to her sister's house the second time, because she claimed that the clock in her car was off by approximately 30 to 45 minutes and not an hour.  Id. at 90-94.  Phillip Taylor arrived at the Subject Property five to ten minutes after Ms. Terry. Exhibit M to Exhibit 1 at 108.

At 12:55 a.m. on January 28, Ms. Terry received the call from her neighbor about the fire.  Ex. M to Ex. 1 at 95.  At 10:35 p.m., earlier that evening, Ms. Terry

received a phone call from Phillip Taylor that lasted approximately four minutes. Between 10:35 p.m. and 12:55 a.m., Ms. Terry did not make or receive any phone calls.  Exhibit 3 to Exhibit M.

In January 2016, Captain Fitzgerald Moseley was a fire investigator and Lieutenant for the Birmingham Fire and Rescue Service (BFRS). See Exhibit 3, Deposition of Fitzgerald Moseley (December 21, 2017) at 5.  Exhibit 4 to Exhibit 3 are the photographs taken by the BFRS. They fairly and accurately depict the property as it appeared right after the fire was extinguished. Exhibit 3 at 19, 20-24. Captain Moseley identified his preliminary report, which is Exhibit 1 to his deposition. Ex. 1 to Ex. 3. Moseley identified the documents produced by the BFRS as Exhibit 2 to his deposition.

He arrived at the subject property at approximately 12:55 a.m. When he arrived, the rest of the firemen had been there approximately ten minutes putting out the fire. Id. at 8-10. Initially, Moseley observed the fire in order to determine where to start his investigation and did not interview anyone. Id. at 11.

Moseley inspected the entire exterior of the building. Ex. 3 at 14.  When he went to the back of the house, Moseley saw cinder blocks sitting in front of the window at the back of the house with the window open above the blocks. Id. at 15 and photo 8 of Exhibit 4 to Exhibit 3.  Moseley believed that the cinder blocks sitting in the front of the open window at the back of the house were suspicious. Id.

11

at 20-24. The window above the blocks was open. After his inspection of the exterior, Captain Moseley entered the back door to begin his investigation of the interior of the subject property. Id. at 25.

Upon entering the kitchen, Moseley noticed a gun in the middle of the floor and also a five-gallon gas can in front of the entrance to the kitchen. Id. at 25. Moseley felt like the gun was out of place and that it had been placed in the middle of the floor so it would be noticed. The gas can sitting in the middle of the floor was also unusual. Id. at 25-26. It seemed to Moseley like both the gun and gas can were set in the middle of the kitchen floor to make sure investigators saw them. Exhibit 3 at 67. Furthermore, most criminals would have taken the gun. Id. at 69-70. Exhibit 2 is Moseley's report. Id. at 71. A lot of the house just had smoke damage, but there was some extensive fire damage in some rooms. Id. at 28-29.

Moseley determined that the fire had been set and was arson. Id. at 33. Moseley detected at least two points of origin in the front left bedroom and also points of origin in the living room. Id. and Exhibit 7 to Exhibit 3.  Moseley identified the "x's" on Exhibit 7, a diagram of the property, with the word "origin" next to them as being the points of origin for the fire. There are four points of origin. Id. at 44-45 and Exhibit 7.   The firefighters reported to Moseley that they smelled gasoline. Ex. 3 at 33-34. Moseley testified that the walls were not burned up inside the house. Id. at 36. They were pretty much intact throughout the house.

It appeared to Moseley that the owner was doing renovations in the bathroom. The toilet was not connected. Id. at 43. Moseley also inspected the interior of the property. Moseley identified numerous photographs of the property. Id. at 44. None of the photos of the interior show any walls being completely burned so a person could stand at the threshold of the front door and see all the way back into and through the house. Id.

Detective James Canino of the BPD interviewed Ms. Terry with Lt. Moseley on February 16, 2016. His deposition of December 21, 2017, is being filed as Exhibit 4. Ms. Terry was given the Miranda Warning before the interview. Exhibit 4 at 35-36.  Canino also found it unusual that a gun was left in the middle of the floor by the burglar because, in many burglaries, the only thing that is taken is a firearm. Id. at 60- 61. It was also odd to find the gas can in the middle of the kitchen floor. Id.  According to Canino the placement of things in the house appeared staged. This included the placement of the gas can and the gun. Not only was it strange that a gas can was found in the kitchen, it was also strange that Terry mentioned it to Canino first. Id. at 92-95.

When Moseley exited the structure at about 1:30 a.m., he was told by the Battalion Chief that Ms. Terry was present. He introduced himself to Ms. Terry and began asking her questions about when she left the house, whether she was having a dispute with anyone and who was the last person at the house. Exhibit 3 at

45. These are normal questions that Moseley usually asks in an arson investigation. Id.

Moseley did not believe Terry's behavior was normal. "I mean, most people react frantically when their house burns." Id. at 48. Terry was not frantic and did not appear to be upset when Moseley saw her. She just asked "did they steal our tvs." Id.  At this point, he became curious as to how Terry would know that the televisions were missing. Id. at 49.  She had not been inside the house.  Id. at 46-47.  Moseley found it unusual that there was lighter fluid in the bedroom, "because people don't normally store lighter fluid in their bedroom. Id. at 76.

Terry initially told Moseley that Mr. Taylor was at the house about the time of the fire and she placed Taylor on the scene between 12:00 midnight and 12:45 a.m. Id. at 51.  Moseley also interviewed some neighbors, who claimed that they did not see anything. Id. at 47.

 Terry initially denied that the gun found in the kitchen was her gun. Then she admitted that it was her gun. Id. at 55. However, she had not yet seen the gun. The fact that she was able to identify the gun as hers, before she had seen it was another red flag for Moseley. Id. at 56. Moseley had three interviews with Terry, the one on the scene, a phone interview, and the interview with Detective Canino. Id. at 56.

During the second interview, Terry went into the elaborate story concerning

the dispute between Phillip Taylor and Jamie Moore. Id. at 56- 57. Terry's story continuously changed. Id. at 58.

Ms. Terry was not very forthcoming to Moseley.  Id. at 52. She stated that she knew who set the fire. Id. at 52- 53. At that point, Moseley had not even told her it was a set fire. Id. at 53. Moseley did not bring up Jamie Moore or the arson prior to Terry bringing up those topics. Id. at 53. Ms. Terry was never candid in Moseley's subsequent telephone interview with her or in the interview he conducted of Ms. Terry with Detective Canino. Id. at 54.

According to Moseley, it was not possible in his opinion for Jamie Moore to have started the fire and commit the burglary in the amount of time he had available.  No one saw any trucks or vehicles leaving the house. Id. at 65. "I don't think Mr. Moore could have took those tvs out, put them in the truck, set the fire, and left the house." Id. at 66. There were no tire tracks in the yard like someone had pulled into the yard. Id. at 67. In fact, there was no way a car or truck could have entered the back yard, because there was a gated fence in the backyard according to Moseley.  Id. at 67.

Moseley confirmed that the first responders reported that the front burglar door was a wrought iron door and was locked when they arrived. Exhibit 3 at 84- 85.

Moseley has not ruled Phillip Taylor and Sharanda Terry out as suspects for

15

the arson. Id. at 91. According to Moseley, based upon all the evidence he acquired, Taylor and Terry were the only real potential suspects. Id. at 92. (Moseley mistakenly lists Phillip Taylor's name as Tim Taylor in the report, possibly because he misheard Ms. Terry. Id. at 92). He stated in regard to Taylor and Terry being suspects: "You know she put either him or her on the scene pretty much. Like I said, if someone else had done it, they had to have a very small window to be able to do it and I just can't see anything that lines up with that." Id. at 93-94.

As stated by Moseley, Ms. Terry gives a bewildering and bizarre account as to how she came to the conclusion that Jamie Moore was responsible for setting the fire and committing the burglary.  She states Moore claimed he did it. Exhibit M to Exhibit 1 at 76-77.  Ms. Terry does not know him, however. She gives a somewhat bewildering description of how Phillip Taylor and Phillip Taylor's nephew got into an altercation with Jamie Moore concerning a girl with whom Jamie Moore and Phillip Taylor's nephew were involved. Id. As a result, Jamie Moore reportedly posted on Facebook that it would be "an eye for an eye."  Id. at 77-78.  Jamie Moore was subsequently murdered.  Id. at 87.  A "girl from down the street" identified only as ReRe told Ms. Terry about Jamie Moore's alleged involvement.   ReRe told Ms. Terry that Iesha Mayhand was Jamie Moore's girlfriend.  Iesha Mayhand was also murdered not long after the fire.  Id. at 88-89;

110-114; 188-192; 194-197.

Detective James Canino was first assigned to the Terry arson case to investigate on February 1, 2016. A true and correct copy of the Deposition of Detective James Canino taken on December 21, 2017, being filed as Exhibit 4. Exhibit 1 to Exhibit 4 is a Birmingham Police Department Detail. It includes the report taken of stolen property made by Terry immediately after the fire at 3:40 a.m. on January 28, 2016, before the police left the scene. Exhibit 4 at 14-15. Exhibit 2 to Exhibit 4 is Canino's actual report.  Id.  The actual report begins on page 7 of Exhibit 2. This is the Field Case Report.  It was also created on January 28, 2016, immediately after the fire. Id. at 18. The information contained in the Field Case Report would have come from the responding officer. Terry was given a copy of Exhibit 2.  See also Ex. 12 to Ex. M to Ex. 1.  Pages 7-9 of the report lists the property Terry reported stolen, even before going into the house.

Canino found it strange that Terry never asked him who he thought committed the arson and burglary. Id. at 89-90.  There were red flags that pointed to Canino that "[t]hings . . . just don't add up." Id. at 90.  Canino also found it strange that, although Terry would not provide him with any information concerning Phillip Taylor, "she put a lot of time and effort into the possibility of it being Jamie Moore." Id. at 90-91.

Canino was never able to obtain any information from Ms. Terry to help

develop a suspect. She never even gave Canino a partial name of a possible suspect to the fire, other than directing Canino towards Jamie Moore. Id. at 98-99. She never told Canino about Jamie Moore's alleged facebook postings. If she had, Canino would have had the intelligence unit investigate. Id. at 101.  Canino "never got the participation that's typically accompanied by a true victim from Ms. Terry." Id. at 109.

The handle of the gun found at the property had tape on it. This was Terry's gun. Canino said, "it would be odd for me to understand anybody owning a weapon legally and having tape on the handle." Id. at 104. Terry is still a person of interest in the arson/burglary. Id. at 110.

Canino testified that he believes Terry has knowledge of who started the fire. Id. at 63-64. Because there were several points of origin, this was not an accidental fire. Id. at 66. He agrees that the fire was arson. Id. at 66.

All of the walls inside the house appeared to be intact when Canino inspected the house. Id. at 72. Canino testified that Terry could not have seen all of the personal property inside the house from where she was standing at the threshold; id. at 72; and that it was strange that Terry was able to identify all of the lost property listed in the report, when she never went into the home and inspected room to room. Id. at 74.

Canino testified that he could not rule out Jamie Moore, Phillip Taylor or

Sharanda Terry as suspects for setting the fire. Id. at 86-87.

Ms. Terry reported to McDonald that her income was approximately $2,700.00 per month or $30,000 to $40,000 per year at the time he interviewed her. Ex. J to Ex. 1 at 2.  She earned her income solely from her monogram business. In her EUO, Ms. Terry could not even guess initially what her income was from January 2015, through January 2016.  She said, "That's still kind of sketchy to me because I probably worked like one or two days a week." Id. at 37.  When pressed she testified that she made $25,000.00 during that period ("Let's stick with that number"… I really can't guess"). Id. at 37-38.  Ms. Terry claims her monthly expenses vary month to month but total approximately $800.00 to $1,100.00 per month. Exhibit 2 at 187.

On December 19, 2017, the deposition of Sharanda Terry was conducted. A true and correct copy of that deposition transcript is being filed as Exhibit 2.  Ms. Terry again testified that she reports all income on her tax returns. Exhibit 2 at 31. She also volunteered that she had tens of thousands of dollars in cash confiscated by the Drug Enforcement Administration, the Bristol Virginia Police Department and two other law enforcement agencies based upon suspicions that she was dealing drugs. Id. at 63. She volunteered that she had money confiscated four times and got it returned to her on all but one of those occasions. Id. at 54-55, 59 and 63-64. She estimated the total amount to be amount confiscated all together to have

been $200,000.  These confiscations occurred between 2006 to 2013.  Id. at 65. Terry claims that all but $10,000 of this money was returned.   Terry also volunteered that she was convicted of felony drug possession in 2008 or 2009. Id. at 134.  The confiscation issues were apparently not related to the conviction for felony possession. Id. at 51-52.  She was also arrested for marijuana possession in 2012. Exhibit 2 at 184-185.

Terry also claimed to have money in a bag hanging from the inside of a wall in the Subject Property on the night of the fire. She does not know how much money was in the bag, but it was more than $10,000.00. Id. at 90-91. It was burned in the fire but she did not include this money in her claim. Id. at 90-93 and101-102. Terry also claimed that she spent over $300,000 or $400,000 on airplane flights. Id. at 53.  According to her tax returns, Terry's total income for 2013 was $15,164.00; for 2014 it was $17,783.00; and for 2015 it was $18,842.00.  Exhibits 2 and 3 to Exhibit M and Exhibit 10 to Exhibit N.

Despite the fact that she previously testified in her EUO that she obtained the money to purchase the house from a friend, Exhibit N to Exhibit 1 at 18-19, she testified in her deposition that she obtained all of the money to buy the house from her "very successful business." Exhibit 2 at 51. She also testified that the confiscated money was earned from her business. Id. at 51, 71-74. Based upon a review of her income tax returns, it does not appear that any of the money she had

in cash that was allegedly confiscated, the money hanging in the wall, or the money she used to buy the house is reflected on her income tax returns, however, even though she claims to have reported all of her income.  Ex. 2 and 3 to Ex. M and Ex. 10 to Ex. N.

In its third report on March 28, 2016, McDonald reported to AXIS that the "fire was found to be a set fire." Exhibit J to Exhibit 1 at p.1, par. 1.  McDonald also reported that, after the fire, two people, Jamie Moore and Iesha Mayhand, were murdered.  Iesha Mayhand was reportedly Jamie Moore's girlfriend. Ms. Terry told McDonald that Mr. Moore burned the Subject Property on the night of January 27 to 28, 2016.

McDonald did not consider the house a total loss.  McDonald concluded that Ms. Terry had "not done very much work" and that she had "just started the restoration." She "had done very little to increase the value" of the home as of the time of the fire. The report states that Ms. Terry wanted to use the insurance money to purchase a new home.  McDonald reported that it was debatable whether the $5,000.00 advance payment should be made to Ms. Terry.  Exhibit J to Ex. 1 at 1-2.  AXIS did advance the $5,000.00 payment to Ms. Terry on March 23, 2016.  A true and correct copy of that check is attached to Exhibit 1as Exhibit K.

On February 1, 2016, Reliable Reports viewed the Subject Property on behalf of AXIS.  Reliable Reports took photos of the property. The photos of the

back of the house show a cinder block below the back window and no tire tracks in the backyard. Exhibit F to Exhibit 1 at 4.

On February 16, 2016, Ronald L. Blankenship, IAAI-CFI, Fire Consultant from Rimkus Consulting Group, Inc. ("Blankenship) began his investigation of the cause and origins of the fire for AXIS.   A true and correct copy of his report is attached to Exhibit 1 as Exhibit I.   Blankenship concluded: (1) there were three separate areas of fire origin; (2) the cause of the fire was the ignition of combustible materials with an open flame device; (3) the use of an ignitable liquid could not be ruled out; and (4) the cause of the fire was incendiary. Exhibit I to Exhibit 1 at 7. The fire was arson. This is undisputed.

On February 17, 2016, Jeff Starnes of G4S Compliance and Investigations began his investigation for AXIS.  On March 10, 2016, G4S submitted its report to AXIS. Exhibit L as Exhibit 1.  G4S found that Ms. Terry had no source of income but was claiming "higher-end furnishings to include several flat screen televisions;" that the authorities suspected arson; and that Ms. Terry could not be ruled out as a suspect.  Id. Starnes also reported that: (1) Ms. Terry had given more than one account of the incident to Canino; (2) the hand-gun was found next to the door, which is inconsistent with the behavior of a burglar; (3) that the house was "gutted" and that there was "very little in the way of  furnishings"; (4) the house did not show any sign of renovations; (5) that Terry's acquisition of the insurance

policy just before the fire and Terry changing her story about the missing televisions were both suspicious; (6) the gas can that was found on the premises after the fire was suspicious; (7) Starnes also spoke to Ms. Terry. Ms. Terry supplied Starnes with Phillip Taylor's number but then told him to wait thirty minutes before calling Taylor. Ex. L to Ex. 1; (8) the toilet and bathroom fixtures had been taken out of the house and the house was uninhabitable. (Ex. L at 5); (9) Ms. Terry claimed that Lt. Moseley was related to Jamie Moore. (Id.); (10) She never entered the house after the fire on the night of the fire. (Id.); (11) Ms. Terry was told by her friend ReRe that Jamie Moore had started the fire. (Moore is sometimes referred to as Jamie Morris in the G4S Report) (Id. at 6); (12) She told Starnes that the dispute with Moore began over a girl and was between Taylor's nephew and Moore and that the girl had allegedly been killed after an altercation with another woman. (Id. at 6); (13) Ms. Terry had been burglarized in November 2014, and this is why she obtained the insurance policy. (Id.); (14) When her neighbor called to tell her about the fire, Terry exclaimed "Oh My God, I just left there." (Id. at 6).   See Exhibit L to Exhibit 1 at 1-7.

Terry's examination under oath ("EUO") was taken on April 19, 2017.  A true and correct copy of the first EUO is attached to Exhibit 1 as Exhibit M. Ms. Terry testified that, before buying the Subject Property she, her boyfriend, whose name is Phillip Taylor, and her nephew, were renting and residing at the Subject

Property.  Exhibit M at 26.  Although she and Mr. Taylor had been dating for six years, she claimed not to know what he did for a living or where he lived, as of the taking of the EUO. Id. at 27-28. Terry had lived at the Subject Property for approximately three years. Id.  Before that, her mother rented it before she passed away.

During the "first or second week of January" 2016, Ms. Terry and others allegedly began working on renovations to the Subject Property. When the renovations began, she moved to her brother's house at 112 Green Springs Avenue.  She also stayed at her sister's residence near her brother's residence.  The nephew moved back in with his mother on January 1, 2016.  She stated that Taylor moved in with his sister or was "just out there." Id. at 26-30 and 45-49.  She identified only two workers who helped her with the renovation who were described as "day laborers."  Ms. Terry could not identify any of them. Id. at 52-53.

As of the time of the fire, the plumbing fixtures were not installed. Exhibit 6 and 7 to Exhibit N.  The balance on Terry's one credit card as of February 4, 2016, was $115.00. Exhibit 9 to Exhibit N. The checking account records Terry did produce at her second EUO show a balance of $20.00 as of December 17, 2015, and expenditures of less than $60.00 between January 18, 2016, and February 18, 2016.  Exhibit 15 and 16 to Exhibit N.  According to the bank account statements

from Terry, from December 17, 2015, through February 18, 2016, her account balances never exceeded $171.00, except for 2 to 3 days when it reached a balance of $1,188.94. Exhibit 15 and 16 to Exhibit N.   The major expenditure of approximately $1,076.96 is presumably the payment of the insurance premium for $1,076.96 on January 22, 2016.  Exhibit 16 to Exhibit N.

While the renovations on the property in early January, 2016, were going on, the bathroom floor was completely removed. As she described it, there was a "hole" in the floor in the bathroom. Exhibit 2 at 175. The whole bathroom was allegedly demolished and that was one of the reasons she would not stay at the subject property after the renovations/repairs began. Id. at 170-171.

Ms. Terry does not know how much the two day laborers who worked on the house were paid.  She paid the laborers and a third-party also paid them.  Once again, she refused to identify the third-party.  She still could not identify the two laborers.  Exhibit N at 28 and 31; Exhibit 2 at 176-185 and 189.

Ms. Terry refused to assist the Fire Department in obtaining Phillip Taylor's phone records. Exhibit M at 54.  On the morning before the fire, January 27, 2016, the door was locked when she arrived at the Subject Property.  The laborers had not arrived.  She testified that they let themselves into the property because they usually got there before her. Id. at 62-63.  The back door had been boarded up by Ms. Terry, "because [she] had a break-in a year before that." Id. at 65.  There were

only two keys, according to Ms. Terry, one of which was in the possession of Phillip Taylor and the other in her possession. Id. at 64-65.

Ms. Terry later testified that two of the five televisions she reported missing were burned and three of the televisions were allegedly stolen. Exhibit 2 at 320-321. The three televisions that were stolen were 47" to 48" televisions. Id.  At the time of the fire, the front door was locked with a burglar door, as previously stated. She has also testified that the back door had been boarded up with three boards. She described it as being "barricaded." Id. at 324. The back door was also closed when Ms. Terry left. Id. at 326-327.

Ms. Terry testified that the front door had a burglar bar on it and was locked before she left immediately before the fire. Exhibit N to Exhibit 1 at 78.  Ms. Terry had boarded the back door shut long before the fire, immediately after the burglary in 2014.  The front door and back door were the only two doors leading outside. Therefore, before the arrival of the BFRS, the only way into the house was a window.  The alleged burglars would have had to remove all of the TV's and other personal property through the back window, based on Ms. Terry's testimony.

Terry did not go inside her house after the fire until the next morning after the fire. Exhibit M to Exhibit 1 at 56-57. She only went to the threshold about a foot inside of the house. Exhibit 2 at 309 and 311. Although she did not enter the house, she was somehow able to give the police the information concerning what

was stolen the night of the fire, before she went inside the house. Id. at 354

Terry testified that the only way the burglars could have gotten in was to push an air conditioning unit through the window in the very back of the house and come in through the back window. Id. at 307 and 323. Terry also admitted that the back window was the only way the burglars could have taken the televisions and personal property out of the house. Id. at 325. A photograph of the back window is among the eleven photographs taken by Lt. Moseley and attached to Terry's deposition as collective Exhibit 26. The seventh and eighth photographs of the eleven photos in Exhibit 26 show cinder block bricks below the back window. Ex. 26 to Ex. 2.

According to Terry's testimony, the burglar would have had to have climbed in the window immediately above those bricks, then taken the property and removed the property back through the window using the bricks as a step. No tire marks are shown in the backyard in photographs seven or eight of Exhibit 26, or any of the other photographs introduced as evidence. The only window opened immediately after the fire was the small window immediately above the bricks. Getting a 47" to 48" television through that window would be difficult, if not impossible.

Terry admitted that no one who could identify her saw her during the time between the telephone call she received from Phillip Taylor at 10:35 p.m. until

after she received the telephone call at 12:55 a.m. from Frank McCoy. Exhibit 2 at 340-344. Neither her brother nor her sister saw her during her travels on the west side of town immediately before the fire. Id. at 346. Ms. Terry is not sure how much jewelry she had in the house at the time of the fire and testified that not all of the jewelry she owned is on the list. Id. at 374. Despite that, she made a claim for all of her jewelry, based upon her insurance claim.

Terry testified that Iesha Mayhand was murdered and that Jamie Moore was murdered. Id. at 359. Terry insinuates that other people, besides Jamie Moore, were involved in the arson and burglary. Id. at 357. She testifies that she learned "on the street" exactly who it was. Id.  However, she does not recall any names. Id. at 357-358.

Despite that the fact that there was a hole in the floor and unknown day laborers were coming into the house, Ms. Terry left over $10,000.00 in cash and tens of thousands of dollars of personal property unsecured at the property when she left before the fire. Id. at 338.

On May 24, 2016, Sharanda Terry's examination under oath continued.  A true and correct copy of Volume 2 of Ms. Terry's Examination Under Oath on May 24, 2016, is attached to Exhibit 1 as Exhibit N.  She again refused to identify any third-parties because none of them wanted to be "involved with the situation." See Exhibit N at 18-20 and 25.

Exhibit 8 to Exhibit N (Terry's 2nd EUO) is Ms. Terry's statement of her full loss.  In that statement, she claims $91,000.00 for the residence and $36,400.00 for losses in personal property.  These are the full policy limits.  The house had just been purchased for $8,500.00.  Ms. Terry claims she only spent $3,000.00 to $5,000.00 on renovations and repairs as of the time of the fire. Exhibit N at 59.

Ms. Terry claims that most of the personal property located at the subject property at the time of the fire was "still brand new."  Id. at 77.  The house was not secure, unknown workers were letting themselves in, she had previously been burglarized at the house but she still left brand new personal property including TV's, computers, and also what she claims to have been valuable jewelry at the house.

Exhibit 7 to Exhibit M is Ms. Terry's initial claim.  Some of the property is old and outdated and other property is depreciated.  She claims that all of the items on the inventory list were purchased "between 2013 up until recently."  Exhibit M at 159.  The TV's were replaced after a 2014 burglary.  Id. The jewelry was also purchased between 2013 and the time of the fire.  Id. at 160; see also Id. at 132-169.

Shortly after the fire and while her claim was pending, Terry told Gary McDonald that she needed a letter stating that she was receiving over $30,000.00 in insurance proceeds. Exhibit M at 60.  She was going to use that money as

earnest money to purchase a new house.  At the time, she was looking at three different properties, one of which had a value of over $77,000.00. Id. at 62-63. Ms. Terry was going to "put down" her "contents money, probably over 30 down on the home." Id. at 67. How she was going to pay the balance is not explained.

When asked about the gas container located in the living room of the house by the fire department and the police, she admitted to having a gas container for her generator, but claimed it smaller than the one found in the house.  Id. at 74. The policemen and firemen never reported a generator having been found at the house.

Ms. Terry admitted receiving the $5,000.00 advance check from AXIS.  She spent some of that money in New Orleans and "lost the rest."  She "went to New Orleans on vacation and I spent all that because I partied like it was 1999." Exhibit M at 87.

According to Ms. Terry, Phillip Taylor "figured out" that Jamie Moore had started the fire.  Id. at 101-102.  Ms. Terry gives a confusing explanation as to what she told the police was taken from the property and what her losses were and the basis for those losses. Exhibit M at 49-50.  According to Terry's testimony, she apparently deals only with cash.  Id. at 21.  The lack of financial records is an obstruction to any financial investigation.

Lieutenant Moseley reported to the policemen that the fire was started

intentionally with an accelerant and entry was forced through a back window. Terry told the officers that five flat screen televisions, a Playstation 4 and various jewelry pieces were missing from the home.  This was before Ms. Terry entered the house after the fire.  A gun was also found. Ms. Terry told the police officers the gun was kept in her dresser drawer and "was out of place" where it was found. On the third page of this report, it indicates it was prepared on January 28, 2016, at 3:40 a.m. Exhibit 2 to Exhibit 3 at 8 – 13.

Ms. Terry has harassed, badgered and attempted to intimidate people investigating the arson and burglary and her claim. She filed a complaint with the police department against Rod Nelson, Esq., she has charged undersigned counsel with fraud, perjury and other bad acts during the course of this case. She has accused Chief Moseley of falsifying a report, fraud and conspiracy and continues to claim that Moseley fabricated his report. Exhibit 2 at 404-405. She contacted the police department and told them that she was thinking about getting the "feds" involved. Terry wanted Chief Moseley off the case. Id. at 423. She spoke to Moseley's superiors and complained about him. Id. at 428, 436-437. Obstructing the investigation through misrepresentations, intimidation, concealment and threats has been Ms. Terry's *modus operandi* throughout this case.

Ms. Terry claims to have been frustrated by the fire and police investigation, because the investigations appeared to be more focused on the murder of Jamie

Moore than the arson at her house.  Id. at 80-84.  Ms. Terry phoned "the Captain",
apparently to complain, and "the Captain" set up a meeting between Ms. Terry, the
fireman (Moseley), and the detective (Canino). Id. at 81.  She claims that Lt.
Moseley was involved with Jamie Moore, for some reason.  Moseley is not related
to Jamie Moore in any way. He has "no clue who he is." Exhibit 3 at 94. He has
had no relationship with Jamie Moore. He has never seen Jamie Moore and never
met him in his life. Ex. 3 at 94.

Ms. Terry admitted to going over the heads of the investigating officers to
their superiors and claims that the officers were upset, especially Lt. Moseley.  Id.
at 83-84.   She questioned the motivation of all of the policemen who investigated
her on the night of the fire.  Id. at 127.  She stated that "everybody just seemed so
insincere that night."  Id. at 127 and 194.  Ms. Terry also refused to identify
witnesses who might provide information concerning the fire, even to the police.
She also refused to identify witnesses to AXIS Insurance Company's attorney. Id.
at 196.

After the interview, Terry went to Moseley's supervisor and played the tape
recording of the interview for him. Moseley thought it was very unusual for a
homeowner/victim of arson to record an interview with the fire inspector. Out of
680 fires he has inspected, it had never happened before. Exhibit 3 at 59. Terry
never answered the same question the same way twice. Id. at 60. Shortly after the

phone interview, Terry lodged a complaint against Moseley. Id. at 64. Mosely has since been promoted to Captain.

Moseley was not able to interview Jamie Moore, because he was killed two days after the fire. Exhibit 3 at 73. According to Moseley, all Terry had to do was tell him the truth. However, after she told him several different stories, he had difficulty deciding which one to accept as the truth. Id. at 73. Moseley knows of no direct evidence or circumstantial evidence that would show that Jamie Moore set the fire. Id. at 73-74.

Terry has complained several times about Moseley. Id. at 99. She came to see his supervisor several times. Id. Moseley has nothing to do with whether the insurance company pays a fire claim. Id. at 100.  Moseley testified that insurance companies do not simply honor claims, because of the fire department investigation and report. They usually have their own certified fire investigator to investigate and report back to them. Id. at 104.

Terry is still a person of interest because of her deceptiveness, refusal to cooperate and other evidence. Most arson victims cooperate and will tell the investigator what they want or need to know. Id. at 101-102.

Terry came back to the Chief's office and wanted Moseley punished or fired. This occurred "recently" before the deposition of Moseley was taken.  However, Moseley was promoted to Captain after the fire occurred. Id. at 104. Nonetheless,

Terry continues to complain: "But she's really been giving the Fire Chief and the Assistant Chief's the blues about, you know, her not getting her insurance money." Id. at 104. She has harassed Moseley, the Chiefs and Assistant Chiefs. Id. at 104.

When asked whether Terry had threatened his supervisor or his Fire Chief, Moseley stated that he received a phone call about Terry from the Fire Chief and the Assistant Chiefs. An Assistant Chief, a Battalion Chief and a Captain were present with the Fire Chief when they called Moseley. Id. at 105-106. Terry had been coming back and forth to the Chief's office continuously complaining. Moseley told the Fire Chief that, based upon the way insurance companies work, that he was not the reason she had been denied the insurance money she coveted. Id. at 106.

Terry called police headquarters and spoke to Canino's supervisor. Id. at 85. She was complaining about Canino and contacted his supervisor a couple of times. Id. at 85-86. Canino felt like Terry was threatening him by insinuating that she would go to the Chief of Police or to the Mayor in order to get him in trouble. Id. at 88-89. Terry attempted to rush Canino to end the investigation by threatening to complain. Id. at 96-97.

On May 20, 2016, AXIS' Attorney, Roderick K. Nelson, Esq., sent a letter to Ms. Terry stating that an EUO of her brother, Sherard Terry, would be necessary and requested documents concerning the home she wanted to purchase.  Exhibit Q

to Exhibit 1.  Mr. Sherard Terry also sent his own letter to Mr. Nelson on May 20, 2016.  Exhibit R to Exhbit 1.  Mr. Terry's letter of May 20, 2016, is filled with profane insults and is obviously meant to intimidate.

On June 16, 2016, Mr. Terry responded to AXIS's request for a EUO with another profane, insulting letter.  A true and correct copy of this letter is attached hereto as Exhibit S to Exhibit1. It is also an attempt to intimidate AXIS, its attorneys and investigators through threats of reports to the Birmingham Bar Association, lawsuits, and the release of purportedly damaging audio-recordings, letters, e-mails and voice-mails. These threats are directed at AXIS for "prolonging the claim." Ex. S to Ex. 1.

Based upon these facts, AXIS determined that Terry had breached the insurance contract by failing to cooperate, committing fraud, and being involved in the arson.  Therefore, the claim was due to be denied.  On June 23, 2016, AXIS filed its declaratory judgment action.

## II.  STANDARD OF REVIEW.

"Summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. _Fed. R. Civ. P._ _56(a)_." Hsu v. Safeco Ins. Co._, 654 Fed. Appx. 979, 980 (11th Cir., 2016) (_per_

*curiam*) (affirming summary judgment for insurer and against insured who breached contract sued on by failing to cooperate and respond to reasonable requests for information during investigation of the claim).  The Supreme Court has determined that in such motions, a judge's function is not to determine the truth of the matter asserted or weight of the evidence presented, but to determine whether or not a factual dispute raises genuine issues for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). In making this determination, the facts are to be looked upon in the light most favorable to the nonmoving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Allen v. Bd. of Public Education for Bibb County, 495 F.3d 1306 (11th Cir. 2007). However, mere conclusions and unsupported self-serving statements made by the non-moving party are insufficient to avoid summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). Therefore, Rule 56(a) "mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322.  See also Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989) (stating, *inter alia,* that "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but 'must set forth specific facts showing

that there is a genuine issue for trial.'"); and Long v. Pilgrim's Pride Corp., 2013
U.S. Dist. LEXIS 156224 (N.D. Ala. 2013) (Kallon, J.) (" '[M]ere conclusions and
unsupported factual allegations are legally insufficient to defeat a summary
judgment motion.' … Moreover, 'A mere scintilla of evidence supporting the
opposing party's position will not suffice; there must be enough of a showing that
the jury could reasonably find for that party.'") (citing Walker v. Darby, 911 F.2d
1573, 1577 (11th Cir. 1990)).

**III.   THE UNDISPUTED EVIDENCE SHOWS THE ELEMENTS OF
ARSON HAVE BEEN ESTABLISHED.**

The insurance policy issued to Terry covers the dwelling and personal
property, unless the coverage is excluded or certain conditions are not met. The
policy excludes losses for intentional loss, which would include arson. If the
insured commits any action or conspires to commit any action with the intent to
cause a loss then no insured is entitled to coverage. Exhibit E at 33.

The elements of arson can be established when the insurer introduces
evidence that proves: (1) arson by someone; (2) motive by the insured; and (3)
unexplained surrounding circumstantial evidence implicating the insured. Bush v.
Alabama Farm Bur. Mut. Cas. Ins., 576 So.2d 175 (Ala. 1991); Great Southwest
Fire Ins. Co. v. Stone, 402 So.2d 899 (Ala. 1981). The undisputed evidence is that

arson was committed in this case. Captain Moseley, the Fire Inspector for the BFRS concluded it was arson, as did Detective Canino and Ron Blankenship, AXIS's Fire Investigator. Terry admits that there was arson. Therefore, the first element for establishing a case for arson and intentional loss is undisputed.

The motive by the insured is money. Terry paid a total of approximately $10,500.00 for the subject property. She also claims to have lost personal property by theft and in the fire. Terry claims $91,000.00 for the loss of the dwelling, approximately nine times what she paid for the house. She reports little income on her tax returns, but engages in a strange explanation of how she can afford to pay for things, which indicates hoarding of unreported income, if the story is to be believed, which is doubtful. If the story is not believed, then she is lying to achieve her goal – getting the insurance money.

Terry claims the loss of $36,400.00 in personal property. However, she testified that some of this property was depreciated and also testified that she was not sure whether all the property was on the premises at the time of the fire and burglary. The amount of jewelry that she claims to have purchased between 2013 and January, 2016, is beyond her economic means, as shown by her tax returns for the years 2013 through 2015, in which Terry claims all of her income was reported. She has an insignificant balance on her credit card.

Apparently in order to get around the argument that she could not afford to

purchase the personal property or even the house, for that matter, she asserts that she had approximately $200,000.00 confiscated, some of which was returned, by police for suspicion of drug dealing. She makes the even more incredible argument that other unreported income was in a bag hanging on the inside of a wall in the residence and that it was burned, but not included as part of her claim. She volunteered the information concerning the confiscation of money and the bag of money hanging in the wall. According to her story, she was hoarding money like a dragon hoards gold.

She assumed that she would be paid the insurance for the personal property items and told AXIS's representative shortly after the fire that she needed the $30,000.00 to make a down payment on a new house worth approximately seven times what she paid for the Subject Property. If Terry did, in fact, have the tens of thousands of dollars she claims to have had when she was faced with confiscation of some money and had the other money hanging in the wall at the time of the fire, then this is evidence of her hoarding money that was not reported on her tax returns. She deals in cash, has a relatively insignificant balance on her credit card, rarely uses her bank account and leaves absolutely no paper trail to determine how much income she has, what her expenditures are and other financial information. She wanted to buy a new house shortly after the fire, even though the house could be repaired, according to McDonald's Third Report, for approximately $29,000.00.

Ex. J to Ex. 1 at p. 3. Despite the "sentimental value" she claims for the house, she did not want to repair it. She wanted a new, different house. The Defendant's motive is greed and money.

There are definitely unexplained surrounding circumstances implicating the insured. The insured initially told the police that she had left the property at approximately midnight. She did not refute her neighbor's statement, which would be against her interest, that he had told the police and firemen that she had left less than hour before she arrived. Indeed, she is the one who testified that he made that statement. Other statements by her show that she left the house before the fire at around midnight. She then changed her story more than once and pushed back the time when she left the house before the fire on January 28, 2016, to 11:15 to 11:20 p.m., 11:00 p.m. and then to approximately 10:40 p.m.  The front door was locked with a burglar door and the back door was barricaded with three boards. The only way to enter the house was through a small window. Her deception and changing story show that she is trying to hide something or mislead. She is changing her testimony for a reason.  He reason is that her original statement to the BFRS and BPD makes her a suspect.  Her changing story makes her more of a suspect, AXIS submits and is her attempt to place herself as far away from the scene as possible physically and temporally.

A window in the very back of the house was open and there were cinder

blocks underneath it. However, there are no tire marks in the yard. It would be difficult if not impossible, for any burglar to remove three 48" television sets through the back window. Taking those televisions and the other personal property out that window and carrying it to a vehicle parked elsewhere outside the backyard, would be impossible in the time allowed, given that the burglars had to move cinder blocks underneath the window, break through the window, climb in, steal the personal property and take it back out the window, take the property somewhere, start a fire in more than one place in the house, climb back out the window and leave in the time allowed. However, Terry does place herself at the scene when the fire started. Terry does not adequately explain these facts implicating her.

Indeed, she has developed her own story that another individual named Jamie Moore broke into the house based upon a vendetta and committed the burglary and arson. The vendetta was allegedly based upon a dispute between Jamie Moore and the nephew of the Defendant's boyfriend, Phillip Taylor.  This story immediately implicates and makes her boyfriend a suspect in the murder of Jamie Moore. This raises the further question as to whether she and her boyfriend were involved in a criminal conspiracy, with Moore being their willing, or unwitting accomplice. Therefore, her bizarre explanation actually increases her potential culpability instead of minimizing it. Ms. Terry has not cooperated with

any investigator in this case and has resisted disclosing information. Therefore, she has not explained the surrounding circumstances that implicate her in the arson.

## IV. INSURED'S FAILURE TO COOPERATE WITH THE INVESTIGATION VOIDS THE CONTRACT OF INSURANCE.

The conditions for coverage include certain duties after a loss. These include the duty to cooperate in the investigation of the claim. Alabama law recognizes the contractual duty of an insured to make a full, fair and complete disclosure of the facts related to the incident in order to enable the insurance company to determine whether the claim should be contested. Metropolitan Cas. Ins. Co. v. Blue, 219 Ala. 37 121, So. 25 (1929); Yorkshire Indem. Co. v. Roosth & Genecov Prod. Co., 252 F. 2d 650 (5th Cir. 1958); United States Fire Ins. Co. v. Watts, 370 F. 2d 405 (5th Cir. 1966); Alabama Farm Bur. Mut. Cas. Ins. Co. v. Mills, 271 Ala. 192, 123 So. 2d 138 (1960); Alabama Farm Bur. Mut. Cas. Ins. Co. v. Teague, 269 Ala. 53, 110 So. 2d 290 (1959).

Terry has failed to cooperate in the investigation of the burglary and arson from the very beginning. She has refused to identify witnesses and other "third parties." She has failed to give a full, fair and complete disclosure of the facts surrounding the fire and the burglary, and has given a constantly changing timeline for what she did on the night to the fire. She has failed to clearly disclose facts that

are relevant to the investigation, including the amount of her income and expenses. She has failed to truthfully and accurately identify the personal property she lost. She has misrepresented the amount and value of her personal property. She has developed a strange and bizarre story or alibi, attempting to lay the culpability for the arson and an alleged burglary at the feet of a person who was murdered soon after the fire and has also implicated the murdered person's girlfriend in that story. The girlfriend was also murdered.  Alibi's do not get any more peculiar than this.

She has persisted in telling the "Jamie Moore" story throughout this case and this is also a failure to cooperate. See Alabama Farm Bur. Mut. Cas. Ins. Co. v. Mills, 271 Ala. 192, 123 So. 2d 138 (1960)(insured claiming that accident was caused by a blowout, when it was caused by insured running the car into a ditch, and persisting in said statement for three and one-half months was a "failure of substantial compliance with the notice and cooperation conditions of the policy). Terry has failed to fully cooperate with any investigator in this case.

Terry has also concealed facts and fraudulently represented facts. Losses are not covered when the insured intentionally conceals, or misrepresents any material fact or circumstances; makes false statements; or engages in fraudulent conduct relating to the insurance coverage and policy issued by AXIS. Exhibit D to Exhibit 1 and Exhibit E to Exhibit 1 at 36. It is undisputed that Terry concealed facts from police and insurance investigators. She concealed facts and evidence in the

proceedings with the Court. She still has not disclosed numerous potential witnesses to the events relating to the fire and alleged burglary, including her bizarre story about Jamie Moore, his involvement and subsequent murder.

Furthermore, Ms. Terry has fraudulently represented where she was immediately before the fire and, as a result of this and her other misrepresentations, stories, and "red-herrings," has further implicated herself in the arson. Her timeline has changed from 12:00 midnight and then all the way back to 10:45 p.m. as far as when she left the property before the fire. She made and received no phone calls from 10:35 p.m. to 12:55 a.m. No one can identify her or where she was during that time period. She had the opportunity to commit the arson during this time. However, as she acknowledged, her neighbor saw her less than an hour before she got back to the subject property at 1:05 a.m.

She has repeatedly changed her story and mislead investigators and the attorneys in this case. She has refused to produce evidence during discovery and has misrepresented the location of that evidence. She has sent investigators on a "wild goose chase" as far as the Jamie Moore story is concerned and done everything to misdirect the discovery and the investigation of the alleged burglary and arson as much as she can. She has violated the concealment or fraud provision of the insurance policy. Therefore, no coverage exists. Malone v. Allstate Indem. Co., 214 U.S. Dist. LEXIS 78684, 2014 W.L. 2592352 (N.D. Ala., June 10, 2014).

## V.    CONCLUSION.

Based upon the undisputed facts, there was an arson at the property. Terry had a motivation to commit the arson. She also has failed to explain circumstances that implicate her in the arson in an adequate manner. In fact, she has made misrepresentations and concealed facts in violation of the insurance policy provisions. She has also submitted a false or fraudulent claim, which includes property that never existed or that she has grossly overvalued. The story she gives for virtually any information related to this case is simply unbelievable. She has committed arson and breached the insurance contract. Therefore, summary judgment is due to be granted to AXIS Insurance Company on all of its claims in the Declaratory Judgment Complaint filed herein on June 23, 2016.

WHEREFORE, PREMISES CONSIDERED, AXIS Insurance Company request this Court to enter an order granting AXIS Insurance Company summary judgment on all of the claims set forth in its Declaratory Judgment Action filed herein June 23, 2016 (Doc. 1) and for such other and further relief to which AXIS is entitled.

Respectfully submitted,

*s/ Walter F. McArdle*
Walter F. McArdle (ASB-2446-r69w)
Roderick K. Nelson (ASB-8004-n69r)
Attorneys for Plaintiff,
AXIS Insurance Company

**OF COUNSEL:**
**SPAIN & GILLON, L.L.C.**
The Zinszer Building
2117 Second Avenue North
Birmingham, Alabama 35203
Ph:    (205) 328B4100
Fax:   (205) 324B8866
email: wfm@spain-gillon.com
email: rkn@spain-gillon.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have on April 12, 2018 served a copy of the foregoing upon Defendant Via Email and Regular Mail:

Sharanda Terry
112 Green Springs Avenue SW
Birmingham, AL 35211
sharandasexquisite1@gmail.com

s/ Walter F. McArdle
Of Counsel