FILED

2018 May-04  PM 12:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **SHARANDA L. TERRY** | ) |
| | ) |
| Defendant, Pro Se | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| **AXIS INSURANCE COMPANY** | ) |
| | ) |
| **Plaintiff,** | ) |

**Civil Action No. 2:16-cv-01021-JHE**

---

## MOTION TO OPPOSE, DISPUTE AND RESPOND
## TO PLAINTIFF MOTION FOR SUMMARY JUDGMENT

---

Comes now is the Defendant/Pro Se, Sharanda L. Terry,   to submit a **MOTION TO OPPOSE, DISPUTE AND RESPOND TO MOTION FOR PLAINTIFF MOTION FOR SUMMARY JUDGMENT .**

## STATEMENTS OF DISPUTABLE MATERIAL FACTS:

Once again the Plaintiff along with their Counsel is trying to deceive the Court with their so called Summary Judgment that is filled with unethical behavior, inconsistent statements false statements, assumptions, accusations, and purjury

among a host of others things with the vast majority coming from their so called expert witness of the Birmingham Fire and Rescue Services (**BFRS**) employee Fitzgerald Mosley.

The Plaintiff's MOTION FOR SUMMARY JUDGMENT, STATEMENTS OD UNDISPUTED MATERIAL FACTS, AND MEMORANDUM OF LAW IN SUPPORT THEREOF., Is filled with multiple DISPUTABLE MATERIAL FACTS along with Law(s) that does not support their judgment. The Defendant prays this Court will deny the Plaintiff's summary judgement and grant a motion to dismiss with prejudice in favor of the Defendant with the claim to be paid in full.

There are **107 paragraphs** some the Defendant agrees with, but has an overall disagreement with some statements throughout the majority of what the Plaintiff's stated in their Summary Judgment to paint their so call picture.  **See Amendment for numbered paragraph.**  Also **EXHIBIT** D and F come with a HARDCOPY DISC with a documented sheet to show and prove certain statements she dispute with the plaintiff's summary judgment.

Responses to **Their Paragraph 1-5:   No response**

Now starting with their page 5 **Paragraph 6** as numbered:  There's nothing stating what time Fitzgerald Mosley started his investigation at the Defendants property. As a matter of Fact Mosley stated on his Fire Investigation Report he got there @**00:45a.m.** on **January 27, 2016 See EXHIBIT A and EXHIBIT C** the Deposition numbered **"page 8"** where Mosley states again he got there @**12:45a.m.** which conflicts with the timing of another **(BFRS) employee Narrative Report** stating they arrived at the scene @**00:48a.m.** after receiving the call @**00:45a.m. January 28, 2016 See EXHIBIT B page.**

**Their Paragraph #7-9:**   The Defendant has made an honest mistake within the time frame  of her leaving her Home surrounding the time of her home incident but throughout this entire case/claims there has been countless time frame errors from the Plaintiff's their Counsel and their representatives and their Expert witness Fitzgerald Mosley.

**Also in Response to their Paragraph #9:**        **SEE EXHIBIT M:, page 32 of JamesCanino** when he also said ***"I'm not going to say the Birmingham Police Department.   "I'm not going to force anyone to do anything against their will"***

Also read the entire page of 31 and 32.


**Their Paragraph #10:**     The Defendant agrees with this paragraph.


**Their Paragraph #11:     From what the Defendant read she agrees with this paragraph.**

**Their Paragraph #12:     The Defendant is human she made an honest mistake regarding the time of when she left her home.**

**Their Paragraph #13-17:       The paragraphs are reflected on the Defendants time frame in which she was under duress, confusion stress she made an honest mistake regarding her time frame See Exhibit S., is when she realized the   approximately   time frame, because she forgot she took that photograph in her car before she left her home on January 27, 2016 as she's stated to the Plaintiff.**

**Their Paragraph #18:**    What I find strange about this paragraph is that the Plaintiff Counsel did not receive their own set of Photographs from Fitzgerald Mosley being that he took the photographs as he stated in his original investigation report and Deposition nor did the Plaintiff Counsel stop the deposition to send for the photographs as he stopped and went "off the record" multiple times throughout Mosley deposition for  unknown reasons and other documents to be sent over to them that date **See page (71-72) of Mosley Deposition.** Then Mosley tried to throw of the Plaintiff Counsel by stating he **"I could have possibly taken these photographs"**. **See page 19 of Mosley Deposition**

### These Paragraphs are basically about (BFRS) Fitzgerald Mosley Investigation Report, Photographs and Deposition

**Their Paragraph #19:**    In Mosley January 27, 2016 Investigation Report he claimed he arrived at the Defendants home at 00:45 and at his deposition with the Plaintiff. He then changes up his story stating he got there "*maybe ten minutes after the,*" the other firefighters arrived which was at **00:48** meaning Mosley would have gotten to the Defendant property @**12:58.**

**Their Paragraph #20:**  What's suspicious is that in the Photographs **SEE EXHIBIT D:, photographs 6 and 8**  the cinder blocks shows a total of three stacked on top of each other and Mosley noted within his typed  investigation report stating **See EXHIBIT A** **_"There was TWO MASONRY BLOCKS observed in front of the back middle window."_** But at his Deposition with the Plaintiff's  he kept stating "**_A_**

**BLOCK or the BLOCK"** throughout his **See EXHIBIT C** and **(see within)** deposition **pages 15 and 20** as if it was just one cinder block **until** the Plaintiff Counsel corrected him later.

**Their Paragraph #21:** From the Photographs that was taken by Mosley himself shows the gun/firearm in a corner within the Kitchen area **See EXHIBIT D:, photographs 12-15** with **photograph 19** show a better view of where the firearm was found allegedly **and also See EXHIBIT G; paragraph 5** where it's noted the firearm was in a **"rear room of the residence laying in its project NORTHEAST CORNER., again** not in the middle of the floor as Mosley stated at his deposition with the Plaintiff Counsel.

**Their Paragraph #22:** In Mosley Investigation Report he claimed only 2 points of origin **See EXHIBIT A** but all of a sudden, he points out four points of origin that's not in his report as a matter of fact it's not even in the Plaintiff's hired Investigator Investigation report they stated/noted four points of origin **See EXHIBIT (Q)** So where did the Plaintiff or their Counsel along with Fitzgerald Mosley come up with this **"four points of origin theory"** then Mosley testified walls were not burned up inside the home but in the photographs Mosley he took shows walls burned in the home **See As EXHIBIT D:, photographs 36 and 40 as the Defendant show the plaintiff in a Diagram of the missing portion of the missing walls See EXHIBIT S.**

**Their Paragraph #23:** **FIRST** the Plaintiff and their Counsel withheld/concealed the Birmingham Fire and Rescue Services 58 Photographs they received from the Defendant throughout their Discovery process they even had known knowledge of the photographs because Mosley stated it in his report.     As the Defendant started on numerous of times throughout this investigation Phillip Taylor his sisters along with the Defendants sister went through the home when the Fire Department gave her the okay to go inside her home and she called 911 for the officers to come back to the scene.., **Therefore when the Defendant stated she only crossed the threshold from her porch into her living room, she could see could see straight into the back bedroom where a television supposed to be at, she could see into the second bedroom door where she a television supposed to be at and standing in that same very position she can see where a tall dresser which a television sat on top of was missing from the location in which it usually be because of a wall has been burned down and you can see SEE EXHIBIT D photographs 36 and 40 along with Exhibit S: from THE LIVING ROOM INTO THE FRONT BEDROOM the charred studs/wood which held up that portion of that wall. Also at the Defendants Deposition she showed the Plaintiff the burned wall See See EXHIBIT (S) it's circled as the Defendant stated she could see straight through her home.**

**Their Paragraph #24:**   This Paragraph alone shows the Plaintiff listen to the February 15, 2016 recorded interview **SEE EXHIBIT F** when referring the statements of Detectives Canino of it appeared staged, because he did not once make that statement at his deposition with the Plaintiff's Counsel.

**AS A MATTER OF FACT THE DETECTIVE NEVER WENT INSIDE THE DEFENDANTS HOME UNTIL FEBRUARY 15, 2016 just to see this unknown Gas Can he knew nothing about until the Defendant DEMANDED** HIM OR HIS SUPERIORS TO REMOVE IT OR SHE WAS GOING TO THE MAYORS OFFICE.   Also **See Exhibit M:, pages 46-47:** when plaintiff's counsel asked Canino did they check the ballistic on the firearm Canino stated **_" I don't believe it's in a position where it could be fired"._**   **_"FIRE DAMAGE"_**   Meaning someone retrieved the firearm from whatever burned location it was originally found in and placed the firearm in the kitchen area in a corner. Also **See Exhibit M:, PLEASE READ THE ENTIRE pages 61-62 and 94-95: You can tell that the Detective is question the action of others who was around after the fire was put out about the Gas Can Issue., in which Canino could not get any type of answers from Mosley as a matter of facts Mosley didn't share his photographs with Detective Canino See Exhibit M:, page 42 Canino stated _"I never received any photographs from the fire department"._**   So Mosley tried to keep those photographs concealed until the Defendant Demanded the Photographs it was a

struggle as she documented with the Court's but she received them.   Also **See Exhibit D:, photograph 19: The _PLAYSTATION_ siting on top of that wooded board appears to have the same type of debris as what's on the floor in dustpans in photograph 18 which make you wonder did someone pick up the _PLAYSTATION_ from off the floor and put in onto of that wooded board and the place the _GAS CAN_ in its place.**   When plaintiff's counsel tried to make Canino say the word staged Canino stated **Also See Exhibit M:, page 60: Canino stated _"PER THE FIRE DEPARTMENT HOW IT WAS DISCOVERED"._**   When plaintiff's counsel tried yet again to make Canino say the word staged Canino stated **Also See Exhibit M:, page 92: _"THE PLACEMENTS OF THINGS SEEMED STRANGE  VERY VERY STRANGE"_**

**Their Paragraph #25:**     In Mosley investigation report **See EXHIBIT A** he noted the defendant **_"arrived at the scene at 01:30 a.m.,_**   and stated that same time at his deposition **See EXHIBIT C:, pages 17 and 18** of Mosley deposition, Now how would he have known that if he was just exiting the house about _**1:30 a.m.,**_

**Their Paragraph #26:**     Mosley did not mention the behavior of the Defendant in his initial investigation report nor did he state the defendant **asked** about her tv's **See Exhibit A**.   Also if you listen to the **See EXHIBIT F:, FEBUARY 15, 2016 recorded  interview between Mosley, Canino and the Defendant** you would hear Mosley  say     **_"you remember me asking you  about_**

*about a television"* Meaning Fitzgerald Mosley initiated the conversation about the missing television inside the defendants home.  The Defendant agrees a lighter fluid bottle doesn't belong in a bedroom and she didn't put it their either.  **She believes either that was done by the suspect(s) or Fitzgerald Mosley himself.** Looking at his investigation report and his statement at **paragraph 2** *"there was a box that housed a 55 inch television in it".* But at Mosley **See EXHIBIT C** deposition on **page 29 Mosley** now claims *a box was empty where a television had been stored".* But when the Plaintiffs counsel asked about the  back bedroom again Mosley now states on **page 30** *"that's where I observed the box with the TV in it.* But then on **page 46-47 Mosley** now claims he *"reentered the structure to see if there were TVs missing. I saw a TV box in the back bedroom and when I came out, the TV's were not present.* Then On **page 48** Mosley **claims** he think he saw a burnt Tv in the living room but the rest of the TVs appeared to be gone *"yes".*

      **Their Paragraph #27:**     The Defendant never made this statement about Mr. Taylor to Mosley or anyone else in this investigation  of this claim or case, that statement is unfounded and untrue.

      **Their Paragraph #28:        On the night/morning of the Defendant's home incident, Mosley mentioned a "black gun" had  been found in the home in the the  kitchen floor to the Defendant and the Defendant did state to Mosley the firearm wasn't hers because he only said a "black gun" after he stated that the**

officers on the scene that night showed the Defendant the firearm and she noticed it was hers and told them to take it and dust it for finger prints because she knew she didn't leave it in the kitchen and also that she gotten/received/inherited from her deceased brother See EXHIBIT G.   BUT MOSLEY AND THE PLAINTIFF COUNSEL CAME UP WITH SOME OF THOSE BOGUS AND UNTRUE STATEMENTS IN THAT PARAGRAPH 28. Also SEE EXHIBIT M:, page 46: Canino stated: *"BECAUSE INITIALLY MS. TERRY SAID IT WAS HER WEAPON"*

**Their Paragraph #29:**    The Defendant was only stating what she heard from different individuals that also told her they were not willing to talk to any authorities on her behalf.

**Their Paragraph #30:**    The Defendant know and feels in her heart Jamie Moore set the fire as she's been stating.   As a matter of fact Mosley mentioned to the Defendant the night/morning about a black gun that and that the fire was set and then started asking his so called routine questions then went to asking about a television and such other things.

**Their Paragraph #31:**    Again that's the opinion of (Mosley) a pathological liar of whom the Defendant feels that he Mosley or an others **stage** those items throughout her home. Also the **"gated fence"** had an **"open and close entry and exit gate door"** The Defendant never stated Jamie Moore name to him that night.

Also **See EXHIBIT M:, page 54-55** Canino stated: *"It's amazing how fast property can be removed when done in theft."* *"The impossible becomes possible,* *"It's hard to say if it was one person or multiple people"*

       **Their Paragraph #32:** **The Defendant stated she lock the wrought iron door before she left.**

       **Their Paragraph #33:** What evidence Mosley collected on January 27 or 28, 2016 that made Shararda Terry and Phillip Taylor suspects when he started and ended his investigation on **January 27, 2016.., and he (Mosley) chose to sit in on the February 15, 2016 between Detective Canino and the Defendant.** Speaking Phillip Taylor he himself spelled his name correctly to Mosley that day of the Defendants home incident., The Police Report had his name spelled correctly that day.

       **Also** Mosley interview Phillip Taylor that night because in his investigation report **See EXHIBIT A:, paragraph 3** Mosley noted *"Mr. Taylor and Ms Terry are suspects due to inconsistencies in their statements and their timeline".* Also **See EXHIBIT C:, page 93** where Mosley stated *"I haven't been able to rule Ms. Terry and Mr. Taylor out." By their multiple statements by their own statements."*

       **BUT MOSLEY CLAIMED HE ONLY INTERVIEWED THE DEFENDANT AND HER NEIGHBORS, See EXHIBIT C:, page 47. So it makes you think, when did MOSLEY ever interview Phillip Taylor.**

BECAUSE THERE IS NO REPORTS FROM ANY AUTHORITIES STATING THEY EVER INTERVIEWED PHILLIP TAYLOR ABOUT THE JANUARY 28, 2016 Home incident of the Defendant.

Matter of fact if he was working with Canino are the Police Department as he claimed he was he would have spelled Mr. Taylor name correctly, it just goes to show another one of his untrue statement See as Exhibit C the entire page 93 with Mosley claiming he wrote his investigation report after the February 15, 2016 their recorded interview with the defendant.

Their Paragraph #34: As See as Exhibit H and I : the Police already had known knowledge and was looking for the Defendant boyfriend Phillip( MOTO) Taylor and his "nephew" Danny (DanDan aka lil Danny) Powell on January 30, 2016/February 1, 2016 of  as suspects for allegedly murdering Jamie Moore.

Which prove the conflict and confrontation before the murder of Jamie Moore that was going on between Phillip, Dan and Jamie Moore.   The Defendant never stated the "nephew"  Dan name to anyone in fear for her life.

Also the defendant feared once again and had to think twice about begging ReRe for any of her information because her kids father and  fiancé Joshua Finney is a known murderer/killer in these Birmingham City streets, as you can see the address above says "2nd ave ?  meaning they really stayed down

the street from the Defendant's home **See as Exhibit I (Joshua Finney) is a allegedly know murderer/killer in the streets of Birmingham Al.**

**To be honest the Plaintiff, their representatives or even their Counsel could or would have cared less if The Defendant Shararda L. Terry ended up dead as long as they didn't have to pay out the insurance policy.**

**Once again the murder of Jamie Moore and Iesha Mayhand has absolutely nothing to do with the Defendant or this case., and there's nothing the Plaintiff can't show or prove otherwise. Again accusations like this/that could get someone killed.**

**Their Paragraph #35: As the Defendant stated on several occasions to the Plaintiff's and their representatives Phillip Taylor went through the home along with his sisters and notice the missing/damage Items/merchandise.**

**ALSO SEE EXHIBIT O:,** it's a **SUBPOENA** to the Birmingham Police Department Dispatch call-in center/board to get an transcript of the 911 call that was placed by the Defendant between 3:00 a.m – 4:00 a.m. to/for the Birmingham Police officers to come back and take a more thorough report upon her entering the threshold of her home and others notice/searching for missing/burned/damaged items/merchandise **See EXHIBIT K and L** with Phillip Taylor name and cell phone number on the reports. **If the plaintiff's never depose Officer Donahoo** how do

they know wheather he stayed or left., They were afraid to her him say he got called back to the scene when they all cleared out about 3:30 a.m. January 28, 2016.

**Their Paragraph #36:** **First of all he said he don't _"RECALL"_. Also why would she ask Detective Canino who committed the arson or burglary, when the only name that's floating around is Jamie Moore until the Detective tells her otherwise.** The Defendant agrees with Detective Canino things just don't add up with Mosley's story.

**Secondly the Detective was asking for personal information of/about Phillip Taylor from the Defendant, if the Detective wanted to know anything about Phillip Taylor he should have spoke with Phillip Taylor instead of putting the Defendant in a position where she had to fear for the consequences of her statements regarding Phillip Taylor to the Detective. ALSO TO BE HONEST CANINO FOUND THINGS MORE STRANGE WITH FITZGERALD MOSLEY STORY THAN THE DEFENDANT IF YOU READ HIS TESTIMONY.**

**Their Paragraph #37:** Again **Jamie Moore** was the only name floating around she had no other names to give him or anyone that asked.

Also if you listen to the **See EXHIBIT F:, _February 15, 2016_ recorded interview with the Defendant, the Detective and Mr. Mosley the last 10 minutes of their conversation was about the Social Medias of Jamie Moore and Iesha**

Mayhand and what was stated. And noted on their pages., **MAYBE DETECTIVE CANINO FORGET ABOUT THAT CONVERSATION.**

**Their Paragraph #38:    Again the Defendant did not legally own the firearm it belonged to the Defendants deceased younger brother in which she inherited it/gotten it from him.    That's how the gun was when she took possession and custody of the firearm.**

**Their Paragraph #39:**    The Defendant stated Jamie Moore on serval occasions because that's the name that was givin to her from her knowledge of what people in the streets were saying.   From what the Defendant was told she believes it was arson as well.

**Their Paragraph #40:    Again Exhibit D:, PHOTOGRAPHS 36 and 40 shows otherwise.**

**Their Paragraph #41:   The Defendant was basically guessing when ever she was asked about her income/income tax returns.**

**Their Paragraph #42:**    At the First EUO, the Plaintiff's asking Defendant about her arrests and it was revealed in April 2016 that the Defendant had a felony possession charge, so that was something the Plaintiff already knew from a previous question it wasn't really volunteered.

**Their Paragraph #43:**    The Defendant agrees to this paragraph.

**Their Paragraph #44:**   The Defendant brother Sherard Terry is a **Chronic Paranormal Schizophrenic** with other **mental illness issues** he threatened to kick the Defendant out of his home if she said his name to the Plaintiff's or any of their representatives including their counsel because he viewed all of them as racist people playing games and lying on his sister. **SEE EXHIBIT N.**

**Their Paragraph #45:**   **As everyone stated it was a set fire no one disputes that., and the Plaintiff's only told what she heard.**

**Their Paragraph #46:**   **McDonald claim service did consider the house a total loss., See EXHIBIT P:, and really the debate was about giving the Defendant $29,000.00/$30,000.00 SEE EXHIBIT P:, for a home and be through with the Dwelling part of the claim but the Defendant did not want that house anymore.  Also See Exhibit T:. A letter from TPI TO AXIS.**

**Their Paragraph #47:**  The Opinion of another investigation company.

**Their Paragraph #48:**  **Now** in this Paragraph the Plaintiff noted in the last sentence ***"This is undisputed."*** But in their **Paragraph #22** they Plaintiff claimed it was "**four points of origin.,**" not three as **Blankenship concluded in this paragraph #48 or his personal findings.**

**Their Paragraph #49:**   **This Jeff Starnes** Character and his **Investigation Report**: his report is based on unfounded and untrue statements made throughout this particular paragraph (1) as far as her time frame true  (2) unfounded and untrue

statement (3) unfounded and untrue statements (4) unfounded and untrue statements (5) unfounded and untrue statements (6) true **the Defendant also agrees with that statement, being that it looks like the gas can was placed their after the fire. (7) because Phillip Taylor would have probably said something awful to an unknown number or person calling his phone** (8) unfounded and untrue statements (9) true: and being that **Mosley mostly lied throughout this case and litigation she stills be that true** (10) She crossed the threshold into her home but Phillp Taylor and his sisters walked through the home that night of the fire (11) true (12) true (13) true **because when the Defendant was renting the from her former landlords it was only a verbal contract and therefore she could not obtain insurance until the home became hers. (14) the Plaintiff is taking every statement the defendant made out of contents.**

**Jeff Starnes stated plenty of lies throughout his report, I mean he never went into the burned structure and the so called interviews he claims he taken with several of people were not recorded being that he's an so call investigator he lied on Detective Canino plenty of times and he also lied and said the Defendant stated to him the murder suspect Jamie Moore was a tenant their at the defendant's home.**

**Their Paragraph #50:**     The Defendant agrees with this paragraph.

**Their Paragraph #51:**     The Defendant agrees with this paragraph but also wants to note that she stated to the Plaintiff's representatives that Phillip Taylor was living at the home some if not all the days of the renovation but Phillip Taylor was coming and leaving as he wanted to around that time.

**Their Paragraph #52:   The Defendant doesn't understand the relevance of this paragraph.  But the bathroom was being remodeled with the help of brother Sherard Terry.  Also See EXHIBIT N.**

**Their Paragraph #53:**     The Defendant agrees with this Paragraph.

**Their Paragraph #54:      The defendant wants to know the relevance to who paid the third party at that time., and yet again she was scared/feared of revealing Sherard's name because of his threats of being thrown out on the streets. Also See EXHIBIT N.**

**Their Paragraph #55:**     First of all how could the Defendant obtained Phillip Taylor phone records.,  Sherard Terry let the laborers in with the Defendants key in which she had given him on a couple occasions.  Also **See EXHIBIT N.**

**Their Paragraph #56:**     *The* defendant agrees with this paragraph until she noticed a photograph within the McDonald claim service photographs **See Exhibit U that shows a burned and damage television on the floor** SO THAT MAKES TWO TELEVISION STOLEN.

**Their Paragraph #57:    The Defendant agrees with this paragraph.**

**Their Paragraph #58:**     The Defendant was only guessing how the items could have been removed from her property being that she wasn't there when the burglary and arson took place, so basically she has no real knowledge on how items were removed from her home the night of of home incident. **ALSO THE TWO FRONT WINDOWS WERE MISSING MEANING THE SUSPECT(s) COULD HAVE WENT THROUGH EITHER ONE OF THOSE FRONT WINDOWS., SEE EXHIBIT D:, photographs 1-5 and 36, 38, 39 and 40.**

**Their Paragraph #59:**     The Defendant stated on several occasions throughout this claim and case Phillip Taylor and his sisters went through the home and described to her what was missing all of what she couldn't see from where she was standing.  Also as stated before the Police was called back to the scene.

**Their Paragraph #60:**     Same response as to **Their Paragraph #59, also until she paid close attention to the Fire investigator photographs 1-5 and 36, 38, 39 and 40.the suspects could have taken the items out through the front windows.**

**Their Paragraph #61:**     **Again** Same response as to **Their Paragraph #59, also until she paid close attention to the Fire investigator photographs 1-5 and 36, 38, 39 and 40. the suspects could have taken the items out through the front windows .**

**Their Paragraph #62:**    The Plaintiff Counsel can not determine what's on or off the list if the Defendant did or didn't put it on the list it means those particular pieces of jewelry was not there at the time of her home incident in January 2016" and she didn't claim them.

**Their Paragraph #63:**    **They** were murdered., also It was all kind of names being thrown at the Defendant about her January 2016 home incident at that time from a lot of people who also told the Defendant,  they would not talk to any authorities on her behalf.

**Their Paragraph #64:**    As stated Phillip Taylor stayed at property some of those nights if not all while work  was being done to the property. Also **See Exhibit:N  Sherard Terry Affidavit**

**Their Paragraph #65:    The Defendant Brother Sherard Terry was a key holder at the of the Defendants home renovation in which he received the Defendant home door key from her where he overseen the project. See Exhibit:N  Sherard Terry Affidavit**

**Their Paragraph #66:**    The Defendant was told by a total of "three independent contractors" it would be policy limit to for the rebuilding of her home..,and the defendant also stated the personal property burned destroyed or stolen  was worth more the the policy limits. **See Exhibit V:,** were the only

contractors gave a lower price and a contract  without signing any type of document as the others wanted her to do.  **See Hal McDonald** May recorded phone calls.

**Their Paragraph #67:**     **The defendant secured her home,.,** That's why the defendant had a wrought iron door for the front and had boards across the back door that was also barricaded.  Also I never heard of anyone removing Tv's, Computers or even Jewelry from their home while a Kitchen and Bathroom are being remodeled along with painting the inside of her home. Also see **Exhibit N**

**Their Paragraph #68:**    The  Defendant still stand firm that there was a  lost way over $36,000 the of the policy limits.

**Their Paragraph #69:**   Obviously the Defendant was thinking the Insurance Company was going to pay on her filed claimed.

**Their Paragraph #70:**    There are no reports about a gas can found in the **living room** of the Defendants home.  As far as the question about the generator See **EXHIBIT C:,  page 20 to Mosley real answer when asked about a Generator "_possibly_"  .,** and the Plaintiff's Counsel only asked Detective Canino., **_"Do you know whether anybody mentioned a generator being at the property?"_** Canino replied **_"NO".,_ SEE EXHIBIT M:, page 103.**

**Their Paragraph #71:**    This is true and correct.

**Their Paragraph #72:**    Again the Defendant was/were only stating what she heard.  Also the Defendant gave the Plaintiff all the financial records that she had in her possession  and what was available to her.

**Their Paragraph #73:**        **See Exhibit: O:,    the Defendant needs to Subpoena the Birmingham Police Department dispatch call center to receive a transcript or/and recording from the Birmingham Police Department the Morning of January 28, 2016 between 3:00a.m.- 4:00a.m., when the Defendant made a 911 call and ask for the same officers to return to her property to and he living room was totally burned and Phillip Taylor and his sisters went through the home to see what was destroyed or missing.**

**Their Paragraph #74:**    The Defendant **doesn't feel** as she harassed, badgered or intimidatied anyone.  The Defendant never contacted the Police Department and made no such claim as a matter a fact the only time she mentioned the word "Feds" was on towards Fitzgerald Mosley of the (BFRS) and the law firm of Spain and Gillon, because of their false statements/reports  and filings.

**Their Paragraph #75:**    So it's okay for the Plaintiff, their third party representatives and their expert witness to make assumptions, allegations and theories but the Defendant can't.

**Their Paragraph #76:**    **Same response as their Paragraph #64 and See any Exhibits G:,** where there **no mentions**  of   (1)**THE FIREARM BEING**

**FOUND IN THE  MIDDLE OF KITCHEN FLOOR**  (2) **GAS CAN IN THE**

**MIDDLE OF THE KITCHEN FLOOR**  or  (3) **TIRE IRON See EXHIBIT K** or

(4)**OR  EVEN  THE  CINDER  BLOCKS**   and  anyone  could  see  why  the

defendant feels the way she feels.

  **Their Paragraph #77:**   **Because the Defendant didn't then and doesn't**

**now believes nothing Mosley says.  See any EXHIBITS associated with Mosley.**

  **Their Paragraph #78:**   That's Mosley testimony

  **Their Paragraph #79:**   The complaint against Mosley was basically about

his investigation and handling of his investigation on the Defendant.

  **Their Paragraph #80:**   That's the opinion of the Plaintiff and Mosley

did use the word **"Most"** not all because some as in the Defendants case feared and

still fears for her life when this one home incident has some much going on within

it.

  **Their Paragraph #81:**   The Defendant was called and invited in for a

meeting to meet with a Captian Willams and Fire Marshal in  October  2017 but she

was able to make the first the meeting so they re-scheduled the meeting for the

following day in which the Defendant tape recorded the entire conversation and it

doesn't  match a lot of statements Mosley made in his deposition.

  **Their Paragraph #82 and #83:**   Within  those (2) Paragraphs no testified

nor  stated the Defendant threatened them., this is the Plaintiff and their Counsel

once again putting words in others mouths twisting up their statements.  **Again if you read the response to their paragraph 76 you can understand why she felt the Birmingham Police Department was playing games.**

**Their Paragraph #84 and #85:**   Sherard actions has nothing to do with the Defendant, Sherard acted on his own behalf not the Defendant.

**Their Paragraph #86:   With the Plaintiff and their Counsel fells to realize is there are multiple disputable statements and their so called undisputed facts within their Summary Judgment  and their so called facst within their own taking of Depositions.  See all the Exhibits attached to this Document.**

**Their Paragraph #87:   One of the Plaintiff's and their Counsel  opinion.**

**Their Paragraph #88 and #89:**    The Plaintiff nor their representatives has not still proven the Defendant played in so call "intentional loss" **and also once again the Plaintiff so called undisputed facts are very much disputable.  The fact is the Defendant plays no roll no matter frivolous circumstances evidence the Plaintiff's and their representatives and other made up against the Defendant.**

**Their Paragraph #90:    We all know when it comes to cases like this money is always the motive but even tho the Plaintiff has called the Defendant black and poor in so many words they still haven't shown or prove the**

**defendant motive was money., THE PLAINTIFF NEVER TOLD OR GAVE THE DEFENDANT AND OPTIONS TO RELOCATE OR FIX HER HOME** and for the $29//30,000.00 they claimed the house could be fix for what still seems to be an unfair value being not all the problems the contractor stated to the defendant was labeled in the Plaintiff's estimated value to repair the Defendants home in which was never discussed with the Defendant.  See Hal McDonald and Steve Parkman recorded May 2016 phone calls.

**Their Paragraph #91:**      Some of the Defendants photographs of personal property before the January 28, 2016 and after that date shows the Defendant owned and had expensive furniture, clothing, appliances, among other items accompanied by a booklet of receipts.  Also giving the fact her brother Sherard Terry testified he's giving his sister and undisclosed amount of money from his inheritance of their mother and fathers insurance policies in which Sherard was the beneficiary of along with other  personal items they both received and sold of others deceased family members in which were given to them both. **See Plaintiff's Exhibit 38 aka 166-21 for receipt booklet they received from the defendant. Also See Exhibit N.**

**Their Paragraph #92:**      Basically the Defendant was really letting the Plaintiff and their Counsel know she put up a fight with the Department of Justice when they confiscated her money **trying to label her a drug dealer, that was founded to be untrue.,** That she's definitely going to put up an fight with the

Plaintiff while their trying to label he an **poor black burglary and arsonist among other names they've called her throughout this claim and litigation.  Once again Sherard Terry gave his sister money and she saves money.**

**Their Paragraph #93:**        The Defendant never asked AXIS or their representatives for **$30,000.00** what she asked for was a letter stating she will be receiving over **$30,000.00** to hold a place for a bid on a home she was interested in. Again no-one stated to the Defendant the home could be repaired., if so ask them to show and prove. Because in May 2016 Steve Parkman acted as if that report didn't exist **Listen to May recording that was filed in November with recording of Steve Parkman and Hal McDonald and the Defendant.     ALSO THE. DEFENDANT WANT THE PLAINTIFF TO SHOW AND PROVE THAT THE DEFENDANT ASKED FOR $30,000.00.**

**Their Paragraph #94:    There are definitely unexplained circumstances surrounding this case and claim period from the Plaintiff's and other within this case besides the Defendant.   She's not the only one who's mistakenly has an issue with remembering of a time frame and others things.   See all Exhibits**

**Their Paragraph #95:**    It's the Defendant's home and the Defendant's insurance policy she would be deemed a "suspect or a person of interest" regardless without another person or persons arrested for the January 28, 2016 crime. Also as stated  **until she paid close attention to the Fire investigator photographs 1-5**

and 36, 38, 39 and 40. the suspects could have taken the items out through the front windows .

Their Paragraph #96:   The Plaintiff's with another one of their well thought out theories. Again until she paid close attention to the Fire investigator photographs 1-5 and 36, 38, 39 and 40. the suspects could have taken the items out through the front windows .

Their Paragraph #97:     As seen throughout some of the Exhibits attached to this Document the story between Phillip Taylor and Jamie Moore are VERY true. SEE EXHIBIT H, I and J.

Their Paragraph #98:     The Defendant dose agree with the Plaintiff and Mr. Mosley this claim, case and investigation is unusual and confusing,  on their end as well.

Their Paragraph #99:   The Defendant feels as she cooperated and given statements of what she can only back up in support of her self.   Also there's nothing implicating the Defendant to the arson.

Their Paragraph #100:   Again The Defendant feels as she cooperated and given statements of what she can only back up in support of her self.   Also there's nothing  implicating the Defendant to the arson. **The Defendant has given the Plaintiff's all third party names, but what the Plaintiff's is not stating is that these so called third party names has no known knowledge of suspects or facts**

of the arson or burglary that occurred on January 28, 2017 at the Defendant home.

Their Paragraph #101:   Jamie Moore name was then and now the only name the Defendant knows of related to her home incident, because of the dispute of him and the Defendant boyfriend and his "nephew". See Exhibits H and I and also EXHIBIT M:. Page 25.

Their Paragraph #102:   This entire paragraph is untrue. Also definitely disputable.

Their Paragraph #103:   The Defendant is human she has made mistakes in her time frame again as with others throughout this claim, case and litigation.

Their Paragraph #104:   Once again the Defendant is only human she remembers she forgets, I mean come on the Plaintiff kicked the Defendant around from person to person.

Their Paragraph #105:   Their facts, are very disputable: There's nothing that implicated the the Defendant in the arson but an "so called anonymous witness"  that claimed they seen her, but yet throughout this investigation that "so called anonymous witness"  that hasn't made a statement in writing or on a recording which leads the Defendant to think that was a false statement from the beginning because if you have a witness to a crime I would think the authorities would secure that witness or their statement.

**Their Paragraph 106: the defendant feels as if her claim is not fraudulent and should be paid in full with a monthly interest rate from the date of filing her claim.**

## BREAKING DOWN EACH AND ALL EXHIBITS

**EXHIBIT A:, (6 pages).** Shows an **6/14/2017** dated document with the attachment of the **sign** Fitzgerald Mosley Fire Investigation Report. No subpoena attachment. With numerous of assumptions, accusations, untrue statements and false claims.

**EXHIBIT B:, (11 pages).** Shows an **April 28, 2017** dated document with the attachment of the **unsign** Fitzgerald Mosley Fire Investigation Report with the proper subpoena attachment. Again with numerous of assumptions, accusations, untrue statements and false claims.

**EXHIBIT C:,.** Shows the Deposition taken by the Plaintiff's Counsel of a Birmingham Fire & Rescue Service employee Fitzgerald Mosley in which he made **false claims, allegations, assertions** and **statements** throughout almost his entire deposition with the Plaintiff. **Also if read through the entire pages of Mosley deposition you can see the Plaintiff's Counsel coaching and spoon feeding Mosley some of those false claims, assumptions, allegations, assertions** and **statements that Mosley was agreeing to.**

**EXHIBIT D:, (4 pages)&HARDCOPY: DISC 1** Shows the **58** photographs of the burned Defendant's structure interior and exterior that the Fire Investigator Fitzgerald Mosley never produced to the Plaintiff, nor did the Plaintiff request the **Material Evidence,** being that **SEE EXHIBIT A and B** they had known knowledge of the "documented digital photograph" as Fitzgerald Mosley noted in his incorrect dated **January 27, 2016 Investigation Report.**

**EXHIBIT E:, ( pages).**    Show the Addendum  Report of Mosley Investigation Report.  Labeling the Defendant Sharanda L. Terry not a suspect.

**EXHIBIT F:, ( 1 page)&HARDCOPY:  DISC 2**    Shows a documented document made by the Defendant along with a true and correct copy of a February 15, 2016 recorded interview with the Defendant, Detective James Canino and Fitzgerald Mosley that shows certain time **marks** that disputes some answers or statements that were made by  Fitzgerald Mosley and James Canino at their deposition with the Plaintiff and their Counsel.

**EXHIBIT G:, (1 page).**    Shows a Birmingham Police Department "Narrative Report, that doesn't list these four important factors of this case: (1) It doesn't mention the gun was found in the kitchen in the middle of the floor (2) It doesn't mention anything about a Gas Can (3) It doesn't mention the "Tire Iron" that was found that was used for the forced entry **SEE EXHIBIT K**  (4) It doesn't mention anything about cinder/masonry block(s).  But as you can see also in this exhibit g:, Mosley to the Police officer the *__"cause of the fire to be intentional"__.*   But Mosley never stated those other need to know first three elements to the Police Officer.

Also what ever happened to the *__"TIRE IRON"__* they found its not noted or documented that the Birmingham Police or Fire Department collected as evidence again what happened to it.  Mosley did tell the officer  on January 28, 2016*__"forced entry was made"__.*    But the at his deposition he now claims when asked by the Plaintiff's Counsel *"were there any signs of forced entry"* Mosley stated *__"NO"__* See

**EXHIBIT C:, page 17.**

**EXHIBIT H:, (1 page).**    Shows emails between Detective Canino and a Detective Johnson having known knowledge about an ongoing a Jamie Moore breaking into

the home of the Defendant and her the fiancé Phillip (MOTO) Taylor by a Citizen Informant.

**EXHIBIT I:, (4 pages).**     Shows some mugshots of alleged possible  suspects (Phillp (MOTO) Taylor, Danny (Lil Danny) Powell and Joshua Finney) of the murder of Jamie Moore of whom was not liked by very many people

**EXHIBIT J:, (2 pages).**     Shows a Birmingham Police Report written by Detective James Canino stating in more or less words the Defendant is not a suspect.

**EXHIBIT K:, (1 page).**     Shows a Birmingham Police Department Detail Report that shows an object ***"TIRE IRON"*** was found to have been used for a ***"FORCED ENTRY".***     But again there's no reports from the Birmingham Police and Fire Department that states/notes either Department collected it as evidence. **NOW THAT'S STRANGE, SUSPICIOUS and ODD,** The "Tire Iron" is noted but not collected.

**EXHIBIT L:, (5 pages).**     Shows numerous errors made by the officer who made this report adding and taking away personal information of the Defendant and witness and with incorrectly to correct address of the Defendant and Witness.

**EXHIBIT M:.**     Shows the Deposition of Detective James Canino of the Birmingham Police Department. **If you read through this entire deposition you can also once again see the Plaintiff's Counsel trying to force feed: false claims, assumptions, allegations, statements and assertions to the Detective.** But he wasn't to gullible like Fitzgerald Mosley.  Although he did forget certain events and statements that were made throughout his investigation.

**EXHIBIT N:, (1 pages).**     Shows a Sign and Sworn Affidavit of Sherard Terry who acted a the General Contractor over the Defendant's Home Renovation and whom also help buy items and materials for the Defendants renovation. Also **See Exhibit R:, page 5 and 7** about Sherard Terry.

**EXHIBIT O:, (2 pages).**     Shows a April 30, 2018 Subpoena to the Birmingham Fire and Police Department to settle this theory the Plaintiff's keep coming up with about how did the Defendant know what was damaged or stolen from inside her home before she went in.  **Well she called 911** and the came back out there to take and Phillip Taylor statement of what was missing and damaged.

**EXHIBIT P:, (7 pages).**     Shows McDonald Claim Service (3) investigation reports.   Within all three reports this company praised the Birmingham Fire Department Investigator Fitzgerald Mosley or **CHIEF MOSLEY** as they called him through their reports.   This company was waiting and hanging on every word their **CHIEF MOSLEY** was telling them. You can read from there first/reserve report from their very last report their **CHIEF MOSLEY** made them very upset with the defendant.   So this CLAIM Company listen to everything their **CHIEF MOSLEY** **stated** about the Defendant and well we see where we're at know.

**The Plaintiff's says their determination on whether or not to pay the Defendants filed claim wasn't based off the investigation of Fitzgerald Mosley but throughout this Exhibit P, it shows otherwise because CHIEF MOSLEY spoke volume in their decision making process.**

**EXHIBIT Q:, (4 pages).**     Show a Rimkus Investigation Report wher on page 3 it noted there was "***three separate area of origin***" but in that same report it **marked** with four "***x's***" with the word "***origin***"   showing **four points of origin now.**

**EXHIBIT R:, (10 pages).**     Jeff Starnes G4S investigation report full of unfounded and untrue statements with malicious intention.

**EXHIBIT S:, (3 pages).**     Shows the Defendant pointing out the burned living room/Front bedroom walls. **See Exhibit D photo 36, 37and 40.  Also** within this **EXHIBIT S:, are photographs not shown at none of the Plaintiff's Depositions**

with any Deponent they depose or the EUO's they recorded with the defendant: *PAGE 2 PHOTOGRAPH SHOWS THE BURNED DOWN LIVING ROOM/FRONT BEDROOM WALLS: PAGE 3 SHOWS A VIEW OF THE BACK BEDROOM AND THE MIDDLE BEDROOM: where the x's are marked are where the Televisions were supposed to be at, so crossing the front porch threshold into the living room area the Defendant notice her television were gone with the help of Phillip Taylor and others shining their cell phones flash lights throughout her home.*

**EXHIBIT T:, (4 pages).** Shows conversation/emails between AXIS, TPI and McDonald Claim Service stating the home structure is a ***"TOTAL LOSS" POLICY LIMITS!***

**EXHIBIT U:, (1 page).** Shows a Photograph taken by Hal McDonald of McDonald Claim Service, a burned and damaged television in the front bedroom floor. This doesn't fit into Mosley stories about the television throughout the Defendants home.

**EXHIBIT V:, (2 page).** Shows the only Contacting Company giving the Defendant a Quote with the Defendant having to sign any type of documents.

**EXHIBIT W:, (1page) & HARDCOPY DISC 3** Shows a photograph/selfie taken by the Defendant hours before the fire department had gotten a call about the Defendants home being on fire on January 27, 2016 in which she left her home moments after taking that photograph. Also shows the Living Room walls intact before the January 28, home incident.

**EXHIBIT X:, (1 page) HARDCOPY: DISC 3** Shows a Message from a deceased Iesha Mayhand to the Defendant asking her to call her, guessing because the message went unread she the send another message to the Defendant threatened

to put the Police on Phillip (MOTO) Taylor.   **The DEFENDANT DID NOT SEE THESE MESSAGES FROM IESHA UNTIL MONTHS AND MONTHS AFTER HER HOME INCIDENT AND THE DEATH OF MS. MAYHAND** At the of those messages their were in another form of messaging call filtered meaning it you wasn't that person friend on Facebook the message is an inbox location of its on.

**ALSO IF THE COURT WOULD ALLOW THE DEFENDANT TO SHOW EXHIBITS V and W to any experts to determine what date and time the photograph in the car was taken along with when did the Defendant actually open up the messages from Ms. Mayhand the defendant would be so great full.**

**EXHIBIT Y:, (6 pages).**      Shows the Plaintiff's Counsel paralegals and secretary filing false affidavit with malicious intention with the wrong dates, both dates of the actual so called conformations off by a **month:** when the defendants time frame is off by one or one and an half hour.

**EXHIBIT Z:, ( 1 pages) & HARDCOPY DISC 3**      Shows a **"CERTIFICATE OF SERVICE"** dated April 12, 2018:  with the Plaintiff's and their Counsel claiming to have EMAIL and REGULAR MAIL **DOCUMENT 172 "SUMMARY JUDGMENT along with the ATTACHMENTS OF ANY EXHIBITS/MATERIAL FACTS/EVIDENCE.**      Well it didn't turn out that way the Defendant had to call between 11a.m - 12t p.m the Plaintiff's Counsel on **APRIL 13, 2018** to asked for the **ATTACHMENTS OF ANY EXHIBITS/MATERIAL FACTS/EVIDENCE** to the Plaintiff's Summary Judgment.  The Defendant spoke

with a Melissa Miller who came up with all types of excuses of why the Defendant didn't receive, also telling the Defendant they didn't mail out anything. The SanDisk thumb drive, is noted  stating the files were on there on April 12, 2018. **THE PLAINTIFF AND THEIR COUNSEL DIDN'T EXPECT THE DEFENDANT TO CALL AND INQUIRE ABOUT THE MISSING ATTACHMENTS. IT WAS A MALICIOUS FAILED ATTEMPT FOR THE DEFENDANT TO HAVE LESS DAYS AND TIME TO BREAK DOWN THE PLAINTIFFS VERY DISPUTABLE  SUMMARY JUDGMENT.**

## THE DEFENDANTS DISPUTES OF
## THE DEPOSITION & FIRE INVESTIGATION
## OF THE BIRMINGHAM FIRE AND RESCUE,  FITZGERALD MOSLEY

**On** page 8, 9 and 10 the Deponent seems not to know what was the actual time of his arrival to the Defendants home that night/morning.  But with the help of the Plaintiff's Counsel they came up with a time frame.

On page 15, Fitzgerald Mosley is not real sure if his guy opened the back door., but in his **January 27, 2016 Investigation Report** he stated his guys told him the back door was opened upon arrival.

On page 17, the Plaintiff's Counsel asked was there any signs of forced entry, Mosley stated "no":  but in the Birmingham Police Department Narrative Report it clearly states "per Mosley force entry was made through a rear window **see**

**Exhibit G.  Also  See Exhibit K:** *Tools Used* *"TIRE IRON."*  **The question is what happened to that** *tire iron?*

On page 19,  Mosley and the Plaintiff's Counsel knows Fitzgerald Mosley Investigation Report doesn't support his story line so Mosley  plays it off by  stating he *"possibly"* may have taken the exterior photographs.  **See Exhibit A and B** with the plaintiff not concerned about the photographs and Mosley concealing them as well.

On pages 15, and 20 Mosley keep referring as to one block being in the that of the Defendants home not the **two masonry blocks** he described in his Investigation report or the **three cinder/masonry blocks shown in See Exhibit D:, photographs 6 and 8.**

On page 21 the Plaintiff's Counsel is showing the Deponent photographs he'd taken in the middle from the street of the front view of the Defendants home, but on page 80 when answering a question about could the Defendant brother Sherard Terry see the Defendant home that night from across the street Mosley stated "***there's no way he could have saw through the front what was happening"***.  Well **see Exhibit D photographs 1-5** shows otherwise being that the Fire Department was shining lights throughout the home.

On page 24, 36, and 37 the Plaintiff's Counsel concealed the fact to Mosley the Defendant in fact did produce to the the **58 photographs of Fitzgerald Mosley on a disc that Walter McArdle employee Melissa Miller signed of on as part of their request for discovery.**

On pages 25, 26, 42, 69 Mosley states the gun was found in the middle of the Kitchen Floor.  But **see Exhibit D:. Photographs 12-15 and 19 shows the gun was not in the middle of the floor.**

**On page** 28, and 29   starts with the many many untrue statements and inconsistent statements about the television inside the home  **page 28 and 29 Mosley** states *"I observed the bedroom.  I went into the bedroom. I observed a couple of boxes-- a box that was empty where a television had been stored.*     But on **page 30** the **Plaintiff's Counsel** who recalled how the actual 58 photographs (**which the Plaintiff's Counsel received from the Defendant**) of Fitzgerald Mosley was taken step by step tried to help him change his story: **Plaintiff's Counsel Walter McArdle** stated: *" It may be of assistance. But in the meanwhile, as you went through the kitchen, you enter the living room is that right?*     (STOP). Where would the plaintiff's counsel get that from? **See Exhibit D:, photographs 16 and 17** that shows the investigator taking a photograph walking into the hallway and a second photograph from the hallway into the living room area.  (**Keep in mind this is about the back bedroom where the TV box was**).    Now still on **page 30** after the Plaintiff's Counsel tried to help coach Mosley storyline,  Mosley now claims in that same back bedroom *"That where I observed the box with the TV in it."*    But then on **page 46** at the the bottom of the page 46 Mosley stated But on **page 29** he stated the box was *"empty"* ( In Mosley Investigation Report paragraph 2 he noted *"There was a box that housed a 55 inch Vizio television in it".*     But then on **page 46** at the the bottom of the **page 46** Mosley stated *" I saw a Tv box in the back bedroom, and when I came out, the TVs was no present"*    Then on **page 48** when questioned by the Plaintiff's counsel Mosley now claims the only tv he say was a burned on in *"living room corner"* also on **page 46** Mosley stated the defendant said to him *"did they steal HER TVs."*   But on **page 48 Mosley** stated the defendant asked him *"did*

*they steal OUR TVs"*  As anyone could tell Mosley is trying to cover something up because his storylines about the television are very inconsistent.

On page 30 Mosley claims he didn't see no space heater, **see EXHIBIT D:. Photo: 17 and 44** you can see the wall space heaters.

On pages **55,  56, 60, and 61** is all a **LIE,** when the Deponent explain about the gun found in the defendants home.  **SEE EXHIBIT F and Exhibit G.**

**On** pages 67-68 the Plaintiff's and the Deponent comes up with their own theories of how the Television could have been taken from the home.,( **they're both having a good time with their theories)**


**On pages 81-84 Mosley really tried to cover this lie up when false claiming a company named Board Up Boarded up the defendants home  on page 82** "Mosley stated "**yes**" until The Plaintiff's counsel help him out and stated Sherard Terry testing he hired some Mexicans workers to board up the home.


# CONCLUSION


The Plaintiff along with their many  representatives including their Counse, their Counsel co-workers and their star expert witnesses along with local authorities all have a lot of  thinsg in common starting with untrue, unfounded inconsistent statements, unethical behavior, slander on the Defendant and her witnesses.  The also tried to cover up a lot of hidden disputable facts the know about but still want to derail the Defendant in their so called Summary Judgment with over 2000 sheets

of documents that only made the look bad when the Defendant broke their Disputable Summary judgment down.

The Plaintiff and their Counsel knowingly concealing and misusing material facts and statements and other gathered information to plot and twist this arson and burglary on the Defendant.  We watched them play hide the ball with audio recording, conceal and withhold numerous of photographs throughout their deposition meeting with witnesses and the defendant. We watched them plot with a local Fire Investigator to point all type of damaging material facts at the Defendant when really with the help of the Plaintiff's Counsel showed their star expert witness is a pathological liar who may have staged the entire placing of the Gas Can, Gun/Firearm, Charcoal lighter fluid bottles and the issues with the Defendants televisions.  From the Fire Investigator Fitzgerald Mosley investigation report to his deposition testimony only proves one thing he a certified lair with a badge.

The Plaintiff's have one fact right out of this entire claim and litigation the Defendants time frame/time line SHES HUMAN.  But throughout the plaintiff's filed documents with the Courts they've also mistakenly noted wrong dates and time lines but it's okay for them.

I mean if you look at **EXHIBIT Y:,** the plaintiff's paralegals were off by a whole month in a sworn affidavit against the Defendant brother that was  do for malicious intentio in the defendants claim and case.

The plaintiffs along with their counsel tried to create an illusion with requesting a page limitations for their summary judgment. But honestly the Plaintiffs along with their Counsel keep stating the same things over and over, putting words in Deponents mouths, concealing photographs, not trying to receive factual material whether if it was to strengthen or weaken their case.

The Plaintiffs Motion For Summary Judgment should be denied on the basis of their so many unfavorable characteristics of the Defendant and her witnesses, irrelevant material, their assumptions, their concealing material, false statements, unfounded statements and claims, false allegations, unethical behavior, malicious intentions, fraudulent behavior and using material evidence that doesn't point the Defendant way.

WHEREFORE, PREMISES, CONSIDERED, SHARANDA L. TERRY, prays the Court will enter a order granting THE SUBMISSION OF THESE TRUE AND CORRECT HARDCOPY/COPY/EXHIBITS/MATERIAL FACTS attached to this Motion to OPPOSE/RESPOND and DISPUTE the Plaintiffs MOTION FOR SUMMARY JUDGMENT also enter orders denying the Plaintiff's Motion FOR SUMMARY JUDGMENT and a Dismissal of the Plaintiff's COMPLAINT FOR DECLARATORY JUDGMENT with perdjudice and grant that the Defendant insurance claim paid in full and also prays the court will grant such other and further relief to which SHARANDA L.TERRY is entitled.

Respectfully submitted

Shararda   L. Terry
112 Greenspring ave sw
Birmingham, Al 35211
(Pro Se)
Ph(850)252-2597

## CERTIFICATE OF SERVICE

I hereby certify that I have May 3, 2018  served a copy of the foregoing upon all counsel of record in this case by filing a copy of same via the Court's CM/EFC system, and via hand delivered to:

Roderick K. Nelson
Walter F. McArdle
Thomas S. Hiley
**Spain & Gillon, L.L.C.**
The Zinszer Building
2117 Second Avenue North
Birmingham, Al 35203