# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| AXIS INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:16-cv-01021-JHE |
| | ) | |
| SHARANDA L. TERRY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff AXIS Insurance Company ("AXIS" or "Plaintiff") brings this action against Sharanda L. Terry ("Terry" or "Defendant"), seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 that it is not required to pay a homeowners insurance claim brought by Terry. (Doc. 1). The parties have filed cross-motions for summary judgment, (docs. 158 & 172[2]), each of which is opposed by the other party, (docs. 174 & 177). However, Terry has moved to withdraw her motion for summary judgment, (docs. 175 & 178); those motions are **GRANTED**, and Terry's motion for summary judgment is **TERMED**. The parties have also filed a number of other motions, (docs. 179, 181, 182, 183, 186, 188, 189, 190 & 191). The court considers those motions first below. AXIS's motion is fully briefed, (docs. 172, 177 & 180), and ripe for review. For the reasons stated more fully below, AXIS's motion for summary judgment is **DENIED**.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 13).

[2] AXIS filed an amended motion for summary judgment, (doc. 172), the same day it filed its original motion for summary judgment, (doc. 160). This memorandum opinion discusses only the amended motion for summary judgment.

## I. Non-Summary Judgment Motions

### A. Terry "Motion to Amend Motion to Oppose, Dispute and Response to Plaintiff Motion for Summary Judgment" (Doc. 176)

In this motion, Terry simply attaches a copy of AXIS's statement of undisputed facts from its motion for summary judgment, breaking it down into numbered paragraphs so that she can dispute them. The motion does not seek relief, and the Clerk is **DIRECTED** to **TERM** it. The undersigned has considered this document as part of Terry's opposition to AXIS's motion for summary judgment.

### B. AXIS Motion to Supplement Evidentiary Submissions (Doc. 179)

In response to Terry's motion to withdraw her motion for summary judgment, AXIS moves to supplement its summary judgment evidentiary submission to include the evidence and arguments it submitted in response to Terry's motion for summary judgment. (Doc. 179). Terry does not appear to oppose this motion. AXIS's motion is **GRANTED**, and its evidentiary submission in support of its motion for summary judgment is supplemented to include the evidence submitted in support of its response to Terry's motion for summary judgment, (doc. 177).

### C. Terry Motion to Respond to Plaintiff's Reply, (Doc. 181), Motion to Withdraw Motion to Respond to Plaintiff's Reply, (Doc. 182), and Motion to Withdraw Docs. 181 & 182, (Doc. 185)

The undersigned construes Terry's motion to respond, (doc. 181), which was filed the day after AXIS's reply in support of its motion for summary judgment and addresses numerous arguments in AXIS's reply, as a motion for leave to submit a sur-reply. Terry has also submitted a motion to withdraw her motion to respond, in which she apologizes to the court for filing the motion and adds additional arguments. (Doc. 182). AXIS opposes both motions, on the basis that the scheduling order does not provide for sur-replies. (Doc. 184). Terry clarifies in a subsequent motion that she intends to withdraw docs. 181 and 182. (Doc. 185). This last motion is

**GRANTED**, and the undersigned has considered neither the arguments contained in the sur-reply nor those contained in the motion to withdraw the sur-reply. To the extent the motion to withdraw the sur-reply, (doc. 182), seeks other relief, it is **DENIED AS MOOT**. The Clerk is **DIRECTED** to **TERM** docs. 181 and 182.

### D. Terry Motion to Substitute (Doc. 183)

Next, Terry moves to substitute Exhibit O of her response to AXIS's motion for summary judgment with a new Exhibit O. (Doc. 183). Terry's original Exhibit O is a subpoena duces tecum directed to the City of Birmingham Fire and Rescue Service Department. (Doc. 177-6 at 4-5). Terry's intent is to submit recordings of 911 calls, along with a Call for Service Detail Report, which she says she picked up on June 4, 2018. (Doc. 183 at 1). AXIS opposes this on essentially the same basis as it opposes the motions discussed in Section I.C. — that there is no provision for Terry to use the motion to supplement her summary judgment response. (*See* doc. 184 at 2).

The original Exhibit O subpoena duces tecum is dated April 30, 2018, and includes a compliance date of May 14, 2018. (*See* doc. 177-6 at 4). Discovery in this case ended on March 9, 2018. (*See* doc. 150). It is unclear why Terry waited until after the discovery deadline to attempt to subpoena these records, nor why her plan to conduct discovery outside the discovery period was never brought to the court's attention, nor why she waited more than three weeks after the subpoena's compliance deadline to retrieve these records. Terry's motion is **DENIED**.

### E. Terry Motion for Court Hearing (Doc. 186)

Terry has moved for a hearing on AXIS's motion for summary judgment. (Doc. 186). Terry's request also contains numerous extraneous arguments. (*See id.*). The undersigned notes that AXIS has also requested oral argument on its motion, (*see* doc. 172 at 1), although it opposes Terry's motion to the extent that it includes additional arguments related to summary judgment,

(doc. 187). Having reviewed the parties' submissions, the undersigned concludes oral argument is unnecessary. Therefore, Terry's motion, (doc. 186), is **DENIED**, as is AXIS's request for oral argument. The undersigned has not considered the summary-judgment-related arguments Terry includes in this motion.

### F. Terry Motions Related to Perjury and Unethical Behavior (Docs. 188, 189, 190 & 191)

Each of these motions details what Terry contends is inappropriate behavior by parties associated with AXIS or by the City of Birmingham. The undersigned has reviewed these motions, and Terry's allegations of criminal and unethical conduct are without merit.[3] Further, to the extent Terry requests the court refer her allegations for criminal prosecution, this civil action is not the mechanism for Terry to alert the FBI or U.S. Attorney's office to what she believes to be criminal conduct, and the undersigned declines to be the conduit for such an alert. These motions, (docs. 188, 189, 190 & 191), are **DENIED**.

These motions resolved, the undersigned now turns to AXIS's motion for summary judgment.

## II. Standard of Review

"Disposition of a summary judgment motion in a declaratory judgment action is governed by the same basic principles that generally rule the grant or denial of such a motion." *Bingham,*

---

[3] For example, Terry argues Birmingham Fire and Rescue Service Captain Fitzgerald Mosley perjured himself by stating that he arrived on the scene at 12:45 a.m. when he really arrived at 12:58 a.m., (doc. 188 at 2-3), and contends a receptionist for Spain & Gillon (the firm that represents AXIS) fraudulently signed an affidavit as "Diane Carr" rather than her full name, Patricia Diane Carr, (doc. 189 at 2-3). Terry also alleges AXIS's counsel Walter McArdle behaved unethically when he responded to an email — sent to his old email address — from a new email address. (Doc. 191 at 2-3). None of these hyper-technical quibbles approaches fraud, perjury, criminality, or otherwise sanctionable conduct.

*Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be

enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## III. Summary Judgment Facts[4]

### A. The Property and Policy

On January 12, 2016, Terry purchased the property located at 6730 2nd Avenue South in Birmingham, Alabama (the "Property"). (*See* docs. 162-1 & 162-3).[5] Terry paid $8,500.00 as the purchase price for the Property, plus other charges: a total of $10,500.08. (*See* doc. 162-2).

On January 14, 2016, Terry submitted an application to AXIS for homeowners insurance. (Doc. 162-1). AXIS issued Policy No. 007759 (the "Policy") to Terry on the same date. (Docs. 162-4 & 162-5). The Policy provides coverage limits of $91,000.00 for the dwelling, $1,000.00 for structures detached from the dwelling, and $36,400.00 for personal property. (Doc. 162-5 at 1).

The Policy contains a state fraud provision applicable in Alabama:[6] "Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject

---

[4] Because the only remaining motion for summary judgment is AXIS's, the following facts are undisputed, or, if disputed, they are taken in the light most favorable to Terry. The undersigned notes AXIS's motion contains a 35-page narrative of allegedly undisputed material facts, many of which are cumulative, immaterial to the two bases on which AXIS moves for summary judgment, or simply argument masquerading as factual assertions. This section has been pared down to omit those facts.

[5] Terry offers substantially the same evidence as AXIS, although her copies are heavily marked up with additional commentary. Consequently, the undersigned refers primarily to AXIS's copies of this evidence, taking into account Terry's notations as extensions of her briefing.

[6] Neither party disputes the policy is governed by Alabama law.

to restitution[,] fines[,] or confinement in prison, or any combination thereof." (*Id.* at 6). The Policy also sets out the following:

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

[. . .]

SECTION I - PROPERTY COVERAGES

A. Coverage A - Dwelling

1. We cover:

> a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and
> b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

[. . .]

C. Coverage C - Personal Property

1. Covered Property

We cover personal property owned or used by an "insured" while on the "residence premises". After a loss and at your request, we will cover personal property owned by others while the property is on the part of the "residence premises" occupied by an "insured".

[. . .]

SECTION I - EXCLUSIONS

We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

[. . .]

8. Intentional Loss

Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss. In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

SECTION I - CONDITIONS

[. . .]

B. Duties After Loss

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:

[. . .]
    5. Cooperate with us in the investigation of a claim;

[. . .]

    7. As often as we reasonably require:

        a. Show the damaged property;

        b. Provide us with records and documents we request and permit us to make copies; and

        c. Submit to examination under oath, while not in the presence of another "insured", and sign the same;

[. . .]

Q. Concealment or Fraud

We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

    1. Intentionally concealed or misrepresented any material fact or circumstance;

    2. Engaged in fraudulent conduct; or

3. Made false statements;

relating to this insurance.

(Doc. 162-5 at 20, 22, 27-28, 30).

**B. The Fire**

On January 28, 2016, at approximately 12:45 a.m., the Birmingham Police Department ("BPD") responded to a fire at the Property. (Doc. 166-8 at 1). Upon arrival, the BPD officers radioed Birmingham Fire and Rescue Service ("BFRS"), which dispatched several engines to the scene. (*Id.*). At approximately 12:48 a.m., BFRS arrived. (Doc. 168-3 at 8).

Terry was was not at the Property when either BFRS or BPD arrived, but she had been there the previous day and night (January 27, 2016) with her boyfriend, Phillip Taylor, her twin brother Sherard, and several laborers. (Doc. 165-1 at 65-67 (260:19-267:9)). After Phillip, Sherard, and the laborers left, sometime between 6:00 p.m. and 8:00 p.m., Terry stayed behind at the Property to "[do] little finishing touches on stuff . . . just doing odds and end . . . ." (*Id.* at 67 (267:10-268-6)). Terry then left the property, but there are conflicting accounts of when she left, including inconsistent statements by Terry herself:

- A BPD police report indicates when she arrived at the scene of the fire, Terry told officers she had left the Property at around midnight and believed she had left a heater on. (Doc. 164-21 at 10). The report also states an anonymous witness on the scene stated to officers Terry had left just prior to the fire beginning. (*Id.*).

- An investigator for McDonald Claim Service, LLC ("McDonald"), which had been hired to investigate the claim by AXIS, submitted three reports. In his first report, dated February 8, 2016, the investigator states "the insured and her fiancée left the home about 11:30 p.m. to go to her sister's house." (Doc. 162-7 at 1). In the second report,

dated February 12, 2016, the investigator reports Terry "stated to us that she had left the home about 11:30 p.m.," but also notes Fire Inspector Lieutenant Fitzgerald Moseley ("Captain Moseley"),[7] who had been at the scene of the fire, had informed McDonald that Terry had reported to him having been gone only for 45 minutes — meaning she had left the home about midnight. (Doc. 162-8 at 1). In the third report, dated Mach 28, 2016, the investigator obtained a recorded statement from Terry that indicated she had left the home "about 11 p.m. or a little later." (Doc. 162-10 at 1).

- On March 2, 2016, Terry provided an in-person recorded statement to investigator Jeff Starnes of G4S Compliance & Investigations. (Doc. 162-12 at 3). In this statement, Terry indicated she had left sometime after 11:00 p.m. (*Id.* at 5). Terry stated she could not recall her conversations with the first responders. (*Id.* at 6).

- During an examination under oath ("EUO") conducted by AXIS's counsel on April 19, 2016, Terry stated she had left "a little after 11:00," which, in her best judgment, was "about 11:15, 11:20, somewhere up in there." (Doc. 163-1 at 18 (71:5-12)). Terry testified a neighbor "told me when I pulled up that — he was like you had just been gone — you hadn't been gone a whole hour, something like that." (*Id.* at 24 (94:20-23)). Terry also testified her car's clock was "set like 30 — it hadn't been in there like two years, 30 or 45 minutes off . . . ." (*Id.* at 24 (94:20-23)).

---

[7] The report refers to Moseley as "Fire Chief Mosley." At the time of the fire, Moseley was a BFRS lieutenant. Moseley has since been promoted to Captain.

- During a second EUO, dated May, 24, 2016, Terry stated she had told the police she had been at the house "forty-five minutes to an hour before [the fire] happened." (Doc. 164-1 at 13 (50:16-21)).

- At her deposition in this case, Terry stated she was "on the other side of town by" 11:15 or 11:20.[8] (Doc. 165-1 at 68 (270:9-12)). Terry said she had taken a "selfie" after receiving a phone call at 10:35 p.m. from her boyfriend, Phillip Taylor ("Taylor"), and "knew exactly when [she] left" because it had been five minutes after taking the selfie. (*Id.* (269:6-22)). Terry explained the discrepancy between her EUO testimony and her deposition testimony by stating she was correcting the EUO testimony (which had been provided to the best of her knowledge) based on seeing the picture's timestamp. (*Id.* (270:13-272:2)). Terry also stated it was "somewhere, what, about an hour, hour and a half, somewhere in there" between her departure and her return to the Property. (*Id.* at 77-78 (308:19-309:3)).

In any event, after Terry left the Property, she went to her sister's house to bathe, but instead sat in the car "Facebooking." (*Id.* at 67 (267:7-18); doc. 163-1 at 23 (90:19-91:13)). Terry then went to a nearby Chevron to buy gas, which took ten or fifteen minutes. (Doc. 165-1 at 68-69 (272:5-9, 276:2-17)). After buying gas, Terry drove to an apartment to visit a friend, but she did not go inside because she did not see the friend's vehicle outside. (*Id.* at 68-70 (272:9-279:9)). Terry then went back to her sister's house and parked for around ten minutes because she was "doing something on [her] phone." (*Id.* at 70 (280:8-22); doc. 163-2 at 1 (102:11-19)). Afterwards,

---

[8] AXIS characterizes this as Terry "changing her story" within the deposition from earlier stating she left at 11:15 or 11:20, (doc. 176 at 11), but Terry clarifies she meant she was already on the other side of town at that time.

Terry planned to "pop up on" Taylor (i.e., show up unannounced). (Doc. 165-1 at 70-71 (280:2-281:15)). No one saw Terry between 10:35 p.m. and 12:55 a.m. (Doc. 165-1 at 86 (341:14-19)).

At approximately 12:55 a.m., as she was stopped at a light prior to turning onto the interstate, Terry received a phone call from her neighbor, Frank McCoy, informing her about the fire.[9] (Doc. 163-1 at 18 (72:8-14); doc. 163-2 at 1-2 (104:23-105:6)). Terry returned to the Property at approximately 1:05 a.m., and Taylor arrived five to ten minutes later. (Doc. 163-2 at 2 (107:4-8, 108:1-3)).

### C. BFRS and BPD Investigations

In January 2016, Captain Moseley was a BFRS lieutenant in investigations. (Doc. 168-1 at 1 (4:10-23)). Captain Moseley arrived on the scene of the fire several minutes after the initial firemen.[10] (*Id.* at 2-3 (8:6-10:23)). On the scene, while waiting for firemen to get the fire under control, Captain Moseley was "basically just observing how the fire was burning, where it was burning from" so that he could get an idea of where to start looking. (*Id.* at 3 (10:19-11:4)). At around 1:00 a.m. the fire was under control, and Captain Moseley began his investigation. (*Id.* at 4 (13:8-14:13)).

Captain Moseley began by performing a 360-degree inspection of the exterior of the house. (*Id.* (14:16-20)). At the back of the house, Captain Moseley spotted a block sitting in front of an open window, which he found suspicious. (*Id.* at 4-5 (15:7-11, 20:3-5)). Captain Moseley testified

---

[9] Terry neither made nor received any phone calls between January 27, 2016 at 10:35 p.m. and January 28, 2016 at 12:55 a.m. (*See* doc. 163-5).

[10] Terry disputes several portions of Captain Moseley's account, mostly as to insignificant details (e.g., the precise time Captain Moseley arrived at the scene and the number of cinderblocks Captain Moseley observed outside Terry's window). (*See* doc. 177 at 4). Where Terry articulates a dispute with a pertinent portion of Captain Moseley's account, it is noted.

when he entered the house through the back door, he saw a gun in the middle of the kitchen floor[11] and a five-gallon can of gasoline just in front of the entrance to the kitchen.  (*Id.* at 7 (25:3-22)).  It appeared to Captain Moseley that the gun was "out of place" and had been placed in the kitchen floor for investigators to see it.  (*Id.* (26:3-6)).  Captain Moseley also thought the gas can was unusual because "if someone's going to start a fire, they normally throw the gasoline can in with it, but the gas can was just sitting there."[12]  (*Id.* (26:9-17)).  He concluded the quarter-full gasoline can was going to be used as a "trailer" (something people use when they want to set a fire or extend it through a structure) to ignite the rest of the house to ensure that it burned completely, but that had not happened.[13]  (*Id.* (26:15-17:14)).  He testified a trailer indicates a fire was intentionally caused.  (*Id.* (28:7-9)).  Terry denied this was her gas can.  (Doc. 165-2 at 77 (306:14-18)).  Captain Moseley found much of the house had only smoke damage, but some rooms had extensive fire damage.  (Doc. 168-1 at 7-8 (28:16-7)).

Captain Moseley determined the fire was a set fire; he had observed no other possible causes (e.g., electrical or other ignition sources).  (*Id.* at 8-9 (32:19-33:11)).  He found points of origin in the front left bedroom and in the living room.  (*Id.* at 9 (33:14-16); doc. 168-12).  Captain

_____

[11] Disputing the location of the gun, Terry points to the police report, which indicates the gun was found in the northeast corner of a rear room in the house rather than the center of the kitchen, (*see* doc. 164-21 at 10).  (Doc. 177 at 5).  Terry acknowledges the gun is hers; it had belonged to her younger brother, and she had effectively inherited it.  (Doc. 165-1 at 89 (356:1-18)).

[12] BPD Detective James Canino ("Detective Canino"), who investigated the arson, also found the placement of the gun and the gas can strange. (Doc. 169-1 at 15-16 (60:5-63:2), 23 (92:6-11)).

[13] AXIS also references Captain Moseley's testimony there was suspicious lighter fluid in a bedroom.  (Doc. 160 at 16).  In response to AXIS's counsel's leading question, "Now, did you see any lighter fluid like a can of lighter fluid anywhere?" Captain Moseley testified "I want to say there was one in the bedroom," and that it "could have been used as a trailer, not real sure."  (Doc. 168-1 at 19 (75:5-76:2)).

Moseley testified the walls were intact and not burned up inside the home.[14] (Doc. 168-1 at 9 (36:2-8)).

When Captain Moseley exited the house, the battalion chief informed him Terry had arrived. (*Id.* at 12 (45:5-7)). Captain Moseley walked down the street and spoke with Terry. (*Id.*). He testified Terry was not frantic or upset. (*Id.* (48:12-20)). He introduced himself as a fire investigator and asked how long Terry had been gone, whether she was having a dispute with anyone, and who was last at the house. (*Id.* (45:10-16)). Terry responded that she had been at the house about an hour before the fire.[15] (*Id.* (46:1-6)). Prior to going inside the house, Moseley testified Terry asked him if her TVs had been stolen.[16] (*Id.* (46:17-20)). Captain Moseley did not know what Terry was referring to, but reentered the house; he saw a TV box in the back bedroom, but no TV. (*Id.* (46:21-47:12)).

_____

[14] AXIS contends this is relevant because, as discussed further below, Terry (suspiciously, in AXIS's view) provided an accounting of the property missing from her home the night of the fire prior to fully entering the house, based on her ability to view portions of the home from just inside the front door. AXIS argues this would have been impossible because the walls were still intact. (*See* doc. 172 at 13).

[15] AXIS also cites Captain Moseley's deposition for the proposition that "Terry initially told Moseley that Mr. Taylor was at the house about the time of the fire and she placed Taylor on the scene between 12:00 midnight and 12:45 a.m." (Doc. 160 at 14). Terry denies she made this statement, (doc. 177 at 9), and other evidence conflicts with it. Captain Moseley testified that Terry "reported speaking to Mr. Taylor between, I want to say, midnight and 12 — midnight and 12:45 . . . [s]he said Mr. Taylor was at the house." (Doc. 168-1 at 13 (51:12-17)). Captain Moseley immediately clarifies that Terry had said "she told [him] she had gone out looking for [Taylor and] ad called him"; when she spoke with Taylor, he was "at home," which Captain Moseley identifies as the Property's address. (*Id.* (52:8-12)). However, as AXIS emphasizes, Terry's phone records indicate no phone calls made or received during that time frame, and Terry stated Taylor was elsewhere in both her first EUO, (doc. 163-2 at 1 (102:19-104:19)), and at her deposition, (doc. 165-1 at 71 (281:2-15)).

[16] In Terry's telling, Moseley initiated the discussion about the TV. (Doc. 165-1 at 80 (317:20-318:23)).

14

In response to Captain Moseley's question about whether she was "having problems with anybody," Terry told Captain Moseley that a man named Jamie Moore ("Moore") was "potentially the one that set the fire." (Doc. 168-1 at 13 (52:15-22)). Captain Moseley had not at that point told Terry that the fire was arson or a set fire, although he testified he did not know whom Terry had spoken with while he was inside the house. (*Id.* at 14 (53:3-11)). Terry stopped talking to Captain Moseley after he asked her what reason Moore would have to set the fire, and that was the end of the interview. (*Id.* (54:1-11)).

Captain Moseley had three interviews with Terry: the interview at the scene described above, a phone interview, and an interview with Detective Canino. (*Id.* (56:2-6)). Captain Moseley found Terry less than forthcoming, and that "everything continuously changed" with Terry's story. (*Id.* (58:16-19)). During the phone interview, Terry stated Taylor had "got into some kind of fight or confrontation" with Moore at some point. (*Id.* (56:15-18)). Terry then "[went] all off into this story of how she didn't like Jamie Moore's girlfriend . . . she would just go off on tangents of everything that had nothing to do with what I was asking." (*Id.* at 15 (57:3-10)).

Detective Canino was assigned to investigate the arson on February 1, 2016. (Doc. 169-1 at 3 (9:9-11)). On February 15, 2016, Detective Canino and Captain Moseley interviewed Terry. (*Id.* at 21 (81:9-11)). Detective Canino read Terry her Miranda rights, and, after Terry signed a document indicating she had been Mirandized, the interview began.[17] (*Id.* at 9 (36:6-10)). Detective Canino described Terry as "very defensive" and the interview as "uncomfortable" due

---

[17] Detective Canino testified "I went in there in post-Miranda, and that's more or less anytime I'm going into open investigation and I don't know suspect from victim, witness. I Mirandize everybody." (Doc. 169-1 at 9 (34:22-35:3)).

to animosity between Captain Moseley and Terry.[18]  (*Id.* at 9-10 (36:12-38:9)).  Terry did not want

to provide information about Taylor because she did not feel comfortable giving that information,

but stated he was "not going to say [Terry] refused [to identify other witnesses]"; because Terry

had "gotten so shook up or defensive . . . [i]t just was not good a good [sic] interview, in [Detective

Canino's] opinion."  (*Id.* at 10 (38:9-39:16)).

According to Detective Canino, "once we started discussing Jamie Moore, [Terry] put a

lot of time and effort into the possibility of it being Jamie Moore, which was odd to [him] because

at one time she wasn't even wanting to give the information on her boyfriend." (*Id.* at 23 (90:22-

91:5)).  At the time of the interview, Detective Canino "[h]ad already got what we call our contacts

on the street, people calling in saying that Jamie Moore had broken in the house after drugs.  Never

heard if he was successful or not in finding what he was looking for, but had set the house on fire,

took a whole bunch of property out of it."  (Doc. 169-1 at 6 (25:16-22)).

In her first EUO, Terry described her belief that Moore was responsible for the arson and

burglary in greater detail.  She stated Moore had claimed he had committed the arson and that

"everybody" had told her Moore had "been bragging about it on social media the next day." (Doc.

163-1 at 19-20 (76:22-77:23); doc. 163-2 at 23 (191:18-192:6)).  She testified she had heard

Taylor's nephew and Moore had been in an argument, and afterwards Moore had "put on Facebook

an eye for an eye." (Doc. 163-1 at 20 (78:2-21)).  A "girl from down the street" named Ree Ree

told Terry that Moore had burned down the house and that the argument had been related to Iesha

-------

[18] As AXIS notes, Terry has no love for Captain Moseley.  Terry has repeatedly accused Captain Moseley of falsifying information or unethical conduct based on her belief Captain Moseley is related to Moore.  (*See, e.g.,* doc. 165-1 at 102 (405:17-406:17)); *see also supra*, n.3.  Captain Moseley testified he does not know Moore, is not related to him, and has never seen or met him.  (Doc. 168-1 at 24 (94:12-18)).

Mayhand, Moore's girlfriend. (*Id.* at 22-23 (88:7-89:14); doc. 163-2 at 4-5 (109:22-114:11)). Moore was murdered on January 29, 2016. (Doc. 169-9 at 2). Iesha Mayhand was also murdered shortly afterwards. (Doc. 169-1 at 20 (78:16-23)).

Detective Canino stated Terry had cooperated in the investigation "in the sense she'll call you back when you ask her to," but has not provided information that has helped develop a suspect. (*Id.* at 25 (98:10-17)). Detective Canino stated "[t]here's no information [Terry] has that would be useful." (*Id.* (97:23-98:1)). However, Detective Canino testified Terry has never mentioned Moore's Facebook postings. (*Id.* at 26 (101:1-16)). And although usually victims "go out of their way to try and help out," Detective Canino testified he "never got the participation that's typically accompanied by a true victim." (*Id.* at 28 (109:21-23)).

According to Detective Canino, the arson investigation remains open. (Doc. 169-1 at 28 (110:1-3)). Terry is still a person of interest, but not a suspect. (*Id.* (109:5-12)). Detective Canino testified that he thinks Terry "has knowledge of who started the fire," and although Terry has identified Moore as the arsonist, "there's no physical evidence to prove he set that fire." (*Id.* at 16 (63:21-23)). According to Detective Canino, although "[a] lot of the information on the street was Jamie [Moore] was responsible . . . there's no evidence to show he did it. There's no evidence to show he didn't do it." (*Id.* at 21 (84:3-6)). Similarly, Detective Canino "can't say Phillip [Taylor] didn't set that fire . . . I can't say that Ms. Terry didn't [set] that fire." (*Id.* at 22 (87:6-10)). Detective Canino cited this lawsuit as a reason why the arson case has "gone a different direction"; rather than worry about "who burned the house, who damaged the property," Terry is now "worried about, I'm assuming, getting paid from the insurance company." (*Id.* (87:11-88:1)).

An addendum to the police report reads: "In the course of the investigation, allegations were made that the vic was at the residence at the time the fire (arson) started. No physical

evidence was discovered that the vic had any knowledge of or played part [sic] in the offense. It is believed the fire was set by as [sic] retaliation towards the boyfriend of the vic of which has also been cooperative with the investigation. Ms. Terry has met with the Det. on numerous occasions w/o incident." (Doc. 169-10 at 2). The addendum was not prepared at Terry's request; instead, Detective Canino testified it reflects "where [BPD was] in the investigation" and had been requested by Detective Canino's lieutenant "on who [Terry] was, where we were with the investigation, why has there not been an arrest made." (Doc. 169-1 at 27-28 (108:8-109:4)).

### D. AXIS Investigation

#### 1. Terry's Finances

Investigating the claim for AXIS, McDonald obtained a statement from Terry indicating she is self-employed and does monograms, with no other income. (Doc. 162-10 at 2). Terry stated her income varies, and she made $2,700.00 the month prior to the fire. (*Id*.). McDonald's third report states Terry "filed between $30-40,000.00 as a guess." (*Id.*). In Terry's first EUO, she stated her income from the previous year was "still kind of sketchy to me because I probably worked like one or two days a week"; Terry stated a friend was giving her money and she was "doing some shirts," making approximately $2,500.00 in the month of January. (Doc. 163-1 at 9-10 (36:18-37:14)). When AXIS's counsel clarified he was asking how much she made for the entire year, Terry stated, "Let's stick with [$25,000.00] because I really can't guess." (*Id.* at 10 (37:15-38:1)).

Responding to Jeff Starnes ("Starnes") of G4S, another investigator working on behalf of AXIS, Terry indicated she is self-employed and has a business called Exquisite Monograms & Clothing. (Doc. 162-12 at 4). Terry initially indicated she was unemployed and had not been working because her embroidery machine is inoperable. (*Id*.).

At Terry's deposition, she could not estimate her gross yearly income but stated she reported that income on her taxes. (Doc. 165-2 at 8 (30:18-31:9)). Regarding her previous testimony she had earned between $25,000.00 and $45,000.00 in 2015, Terry stated: "I kept saying I don't know, but he wanted a number, so I just — everything was to the best of my knowledge. I threw a number out there." (*Id.* (31:10-21)). Terry also stated between approximately between 2006 and 2013, she had had large sums of money confiscated four times by various agencies, including the DEA, totaling "a little over $200,000"; all but $10,000.00 of this money had been returned. (*Id.* at 13-15 (52:23-66:1)). Terry stated that her "money burned along with the house," referring to "way more than $10,000" that had been concealed in a storage space behind a wall, hanging from a bag on a nail. (*Id.* at 23-27 (90:10-107:10)).

According to her tax returns, Terry's gross income for 2013 was $15,164.00, for 2014 was $17.783.00, and for 2015 was $18,842.00. (*See* docs. 163-14, 163-15, 163-16 & 163-17).

## 2. Value of Terry's Claim

Terry submitted a "Statement as to Full Cost of Repair or Replacement." (Doc. 164-9). In the statement, Terry claims $127,400.00 — the full value of the policy — as the amount of her loss. (*Id.*). This breaks down into $91,000.00 for the replacement cost of the property and the remainder in personal property. (*Id.*; doc. 165-1 at 98 (391:19-392:23)).

On February 7, 2016, Terry submitted an inventory of the contents of the house. (Doc. 163-12). Terry reported various electronics missing or destroyed, including five TVs ranging in size from 47 to 60 inches, video game systems, a stereo, and several iPads. (Doc. 163-2 at 8-12 (132:4-145:4)). Terry testified she had replaced the TVs after a previous burglary. (*Id.* at 15 (159:14-18)). Terry also included clothing and jewelry in the inventory. (*See* doc. 163-12). Terry

testified she has receipts for most of the items on the inventory — "[b]asically my contents" — which she had provided to the adjuster. (Doc. 163-2 at 16 (162:13-16, 163:3-13)).

Terry testified she did not go inside her house until the next morning after the fire; instead, she had stepped just through the threshold, "probably a foot" into the house. (Doc. 165-1 at 78 (309:4-9, 311:7-18)). Terry stated that from the threshold of the house, she could get a clear view of the whole house; specifically, she could see into a bedroom and did not see a TV on the stand. (Doc. 163-2 at 7 (126:15-18, 127:16-21)). Terry reported stolen electronics and jewelry to the police prior to entering the house. (Doc. 164-21 at 8-9). Terry also testified that Captain Moseley asked her if a TV had been "back there," which led her to believe that everything had been taken until the next day when she realized most of it had been burned.[19] (Doc. 165-1 at 80 (317:20-318:23)).

In its first report, McDonald stated "[t]he home is a total loss." (Doc. 162-7 at 1). However, by its third report, McDonald no longer considered the home a total loss. (Doc. 162-10 at 2). Instead, it found Terry was in the process of remodeling the home and had not done very much work to repair it yet. (*Id.*). McDonald noted Terry had indicated she was buying another home

---

[19] Terry testified she believed the burglar or burglars had entered through the back window, above the stacked cinderblocks, by removing the air conditioner unit. (*Id.* at 81 (322:13-324:2)). The back door was "barricaded" with three boards when Terry left. (*Id.* (324:12-22)). AXIS states Terry testified "the back window was the only way the burglars could have taken the televisions and personal property out of the house." (Doc. 160 at 26-27). This misstates Terry's testimony. AXIS's counsel asked Terry directly to clarify that her "testimony is that the burglar would have taken the goods, as it were, out that window?" (Doc. 165-1 at 82 (326:8-11)). Terry responded: "No, that's not what I'm saying. I don't know how it happened." (*Id.* (326:12-13)). Terry then speculated the burglars could have exited the door, which was open on her return. (*Id.* (326:13-327:19)).

for about $30,000.00 and stated no replacement cost would be owed under the policy if Terry did so. (*Id.*).

## IV. Analysis

AXIS argues it is entitled to summary judgment on two grounds. First, it says the undisputed facts show that no coverage exists under the policy due to arson. (Doc. 172 at 37-42). Second, it contends Terry has breached the policy by failing to cooperate in the investigation. (*Id.* at 42-45). Each ground is discussed separately below.

### A. Arson

Under Alabama law, arson is a defense to denial of coverage by an insurance company. *Great Southwest Fire Ins. Co. v. Stone*, 402 So.2d 899, 900 (Ala.1981). To make out a *prima facie* case of arson, an insurance company must show three elements: (1) "arson by someone"; (2) "motive by the [insured]"; and (3) "unexplained surrounding circumstantial evidence implicating the [insured]." *Id.* AXIS contends it has met this standard.

The first problem for AXIS is that the defense of arson is a means to get to the jury, not a method of bypassing it. In *Hillery v. Allstate Indemnity Co.*, 705 F. Supp. 2d 1343 (S.D. Ala. 2010), the court set out the effect of making out a *prima facie* case of arson under Alabama law:

> Defendant's position is that, because it can make out a *prima facie* showing of arson, it is entitled to summary judgment on plaintiffs' breach of contract claim. This contention is a *non sequitur* that fundamentally misapprehends the import of a *prima facie* showing of arson under Alabama law. By making such a showing, an insurer can withstand a summary judgment motion or motion for directed verdict brought by the insured as to the arson defense (*i.e.,* the insurer can present that defense to the jury). But Allstate improperly conflates a *prima facie* showing of arson with an entitlement to summary judgment on that defense. Alabama law does not provide that an insurer's mere *prima facie* showing of arson, without more, negates an insured's breach of contract claim as a matter of law. It does not; rather, a *prima facie* showing merely raises an inference that the insured committed arson, so as to enable the insurer to present its arson defense at trial. Simply put, "[t]he fact that [an insurer] has

produced evidence raising an inference that the insured willfully burned the property covered by the policy simply means there is sufficient evidence for the issue to go to the jury." *Jackson,* 2007 WL 3287369, at *7.

*Hillery*, 705 F. Supp. 2d at 1361. Although *Hillery* is a breach of contract action, AXIS provides neither argument nor reason to conclude the arson defense should apply differently in a declaratory judgment action. Instead, it simply assumes showing a *prima facie* case entitles it to summary judgment. None of the case law AXIS cites supports this application of the arson defense. *See Bush v. Alabama Farm Bureau Mut. Cas. Ins. Co.,* 576 So. 2d 175, 179 (Ala. 1991) (discussing evidence to support jury's verdict for insurer on arson defense); *Great Southwest Fire Ins. Co. v. Stone*, 402 So. 2d 899, 902 (Ala. 1981) (reversing directed verdict for insured on defense of arson; defense should have been submitted to the jury).

Even if AXIS were correct that it could in theory achieve victory simply by showing no factual dispute as to its *prima facie* case of arson, it cannot do so in this case because factual disputes abound as to the second and third elements. AXIS alleges the facts show Terry's motive for arson was money. (Doc. 172 at 38-40). It points to the difference between the purchase price for the house and the amount of the insurance claim — approximately $80,500.00 — as well as Terry's "strange explanation of how she can afford to pay for things." (*Id.* at 38). It follows this with the conclusion that Terry's story "indicates hoarding of unreported income, if the story is to be believed, which is doubtful[, and i]f the story is not believed, then she is lying to achieve her goal — getting the insurance money." (*Id.*). The remainder of its argument tracks this: Terry's income does not support the purchases she allegedly made, and her explanation that a large sum of confiscated money was returned to her by the police is part of an "incredible" argument, (*id.* at 38-39); the money Terry claims she had "is evidence of her hoarding money that was not reported on her tax returns, (*id.* at 39); Terry "deals in cash, has a relatively insignificant balance on her

22

credit card, rarely uses her bank account and leaves absolutely no paper trail to determine how much income she has, what her expenditures are and other financial information," (*id.*); and Terry wanted to purchase a new house after the fire, rather than repair the current house, (*id.* at 39-40).

What AXIS does not acknowledge here is that the court may not discount Terry's explanations just because they seem unlikely. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Anderson*, 477 U.S. at 255. AXIS explicitly invites the court to make a credibility determination as to whether Terry actually had the money and property she testified she had — whether Terry's story is "unbelievable," (doc. 172 at 45), "incredible," (*id.* at 38), or "not believable," (doc. 180 at 7). The court may not do that. Further, whether Terry reported the income on her tax returns goes to the weight a factfinder might place on her testimony, not whether it should be discounted entirely.[20]

AXIS's argument for unexplained circumstances implicating Terry is similarly flawed. AXIS highlights Terry's multiple accounts of when she left the house, which it says shows Terry is "trying to hide something or mislead . . . she is changing her testimony for a reason." (Doc. 172 at 40). That reason, according to AXIS's theory, is that Terry is attempting to make herself less of a suspect by "placing herself as far away from the scene as possible physically and temporally." (*Id.*). The court may not infer that at summary judgment. Here, Terry argues her initial

---

[20] In its reply, AXIS contends Terry's claims of hundreds of thousands of dollars in cash is "not supported by any admissible evidence or any theory of logic." (Doc. 180 at 5-6). The evidence to support this is Terry's testimony, regardless of how credible AXIS finds it. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012) ("[E]ven in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment.").

assessments of the time she left are a product of the "duress, confusion[, and] stress" she felt after the fire and caused her to "ma[k]e an honest mistake regarding her time frame," which she has since resolved by referring to the timestamp of the "selfie" she took in her car before she left the house. (Doc. 177 at 3). A jury could find this explanation, which Terry gave under oath at her deposition, (*see* doc. 165-1 at 68 (270:13-272:2)), sufficient such that it need not infer Terry's evolving testimony was intended to mislead.[21]

AXIS admits Terry has an alternate explanation for the fire:

> Indeed, she has developed her own story that another individual named Jamie Moore broke into the house based upon a vendetta and committed the burglary and arson. The vendetta was allegedly based upon a dispute between Jamie Moore and the nephew of the Defendant's boyfriend, Phillip Taylor. This story immediately implicates and makes her boyfriend, and possibly her, a suspect in the murder of Jamie Moore. This also raises the further question as to whether she and her boyfriend were involved in a criminal conspiracy, with Moore initially being their willing, or unwitting accomplice and ultimately the "fall-guy." Plaintiff submits that she could have also learned of Moore's murder and then conveniently used him as the scapegoat after his death. Therefore, her bizarre explanation actually increases the confusion and the likelihood of her potential culpability instead of minimizing it. Ms. Terry has not cooperated with any investigator in this case and has resisted disclosing information. As Lt. Canino and Capt. Moseley recognized, this is unusual. She has enhanced and encouraged confusion, instead of providing accurate information. She does not appear to want the arson solved. She has not explained the surrounding, unusual circumstances that implicate her in the arson.

---

[21] Notably, because AXIS explicitly relies on the internal inconsistencies in Terry's testimony, it is not asking the court to apply some variant of the "sham affidavit" doctrine. Under that doctrine, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1161 (11th Cir. 2012) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984)). But AXIS does not contend any of Terry's testimony ought to be stricken; consequently, it cannot ask the court to believe the parts of Terry's testimony that support its arguments and disbelieve the other parts.

(Doc. 172 at 41-42). AXIS's attempts to cast doubt on the believability of this story require the court to make inferences unfavorable to Terry (Terry has implicated Jamie Moore to disguise the true nature of the fire), weigh the evidence (Terry's account makes her involvement in the arson more likely), and speculate (Terry could have decided to scapegoat Jamie Moore after his death), none of which is permissible at summary judgment. AXIS also ignores the addendum to the police report; although it does not absolve Terry, at a minimum it creates a question of fact about the viability of Terry's alternative explanation.

AXIS is not entitled to summary judgment on its arson theory.

**B. Failure to Cooperate**

AXIS's second argument is that Terry has breached her duty to "[c]ooperate with us in the investigation of a claim," consistent with the Policy. (Doc. 162-5 at 28). Therefore, it claims, no coverage exists for Terry's claim. (Doc. 172 at 44).

Under Alabama law, an insurer may decline to cover a claim when the insured fails to comply with a policy condition requiring the insured to cooperate in the insurer's investigation of the claim. *Williams v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 416 So. 2d 744, 746 (Ala. 1982). "Where an insurer attempts to avoid coverage obligations based upon a defense that its insured breached a 'cooperation clause,' the insurer has the burden not only to show that the insured's failure or refusal to cooperate was 'material and substantial,' but also that the insurer suffered prejudice as a result."[22] *QBE Ins. Corp. v. Blount Med. Ctr. Partners*, No. 2:08-CV-2347-PWG, 2010 WL 11565124, at *6 (N.D. Ala. Apr. 19, 2010) (citing *Ex parte Clarke*, 728 So. 2d 135, 141

---

[22] Consistent with Alabama law, the Policy states AXIS has "no duty to provide coverage under this policy if the failure to comply with the following duties [including cooperation] is prejudicial to us." (Doc. 162-5 at 28) (emphasis added).

(Ala. 1998); *Williams*, 416 So. 2d at 746; *Home Indem. Co. v. Reed Equip. Co.*, 381 So. 2d 45, 48 (1980); *Auto-Owners Ins. Co. v. Rodgers*, 360 So. 2d 716, 719 (Ala. 1978)).  Non-cooperation is prejudicial if the failure to cooperate "negate[s] the only evidence the insurer could offer in defense," *Williams*, 416 So. 2d at 747, or deprives the insurer of the ability to conduct an investigation and mount a defense, *see Colorado Cas. Ins. Co. v. The Kirby Co.*, 2008 WL 149996, at *4 (M.D. Ala. Jan. 14, 2008).  "Moreover, the ultimate question of whether or not the noncooperation is material and substantial is a question for the trier of fact." *Williams v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 416 So. 2d 744, 747 (Ala. 1982) (citation omitted); *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Teague*, 110 So. 2d 290, 293 (1959).  "The burden to establish the insured's failure to cooperate and resulting prejudice lies with the insurer." *QBE*, 2010 WL 11565124, at *11 (citing *Clarke*, 728 So. 2d at 141).

In conclusory terms, AXIS states Terry has failed to cooperate by: (1) refusing to identify witnesses; (2) failing to give a full, fair, and complete disclosure of the facts; (3) giving a changing timeline for her actions on the night of the fire; (4) failed to disclose facts related to her income and expenses; (5) failed to truthfully and accurately identify the personal property she lost, including by misrepresenting the amount and value of that property; and (6) "developed a strange and bizarre story or alibi" related to Jamie Moore, which she has "persisted in telling." (Doc. 172 at 42-43).  AXIS does not contend Terry has failed to provide documentation it needs to adjudicate the claim, give a statement under oath, or furnish proof of her loss.  Any of these might be appropriate for resolution at summary judgment, because each would be an unambiguous

roadblock to a full investigation by AXIS.[23]  *See, e.g., Hillery v. Allstate Indem. Co.,* 705 F. Supp.

2d 1343, 1363 (S.D. Ala. 2010) (in bad faith action, granting summary judgment to insurance

company where insureds provided information they conceded was inaccurate and refused to

cooperate in correcting that information); *State Farm Fire & Cas. Co. v. Richardson*, No. CIV.A.

070791WSB, 2008 WL 4531765, at *7 (S.D. Ala. Oct. 9, 2008) (in declaratory judgment action,

granting summary judgment to insurer where insured refused to answer written questions or

provide a recorded statement); *Shan Hsu v. Safeco Ins. Co. of Indiana*, 654 F. App'x 979, 980 (11th

Cir. 2016) (in Georgia breach of contract action, affirming summary judgment for insurer;

insured's failure to produce specific documents after detailed request, with no excuse or

explanation, was a breach of policy's cooperation provision).[24]  Instead, with the possible

exception of Terry's failure to identify witnesses, each of AXIS's non-cooperation theories asks

the court to weigh Terry's testimony against the evidence and conclude Terry has lied about

something.[25]  As discussed above, the court may not do so at summary judgment.

---

[23] AXIS conflates, without any legal support, Terry's alleged failure to cooperate in the BFRS and BPD investigations with her failure to cooperate under the policy.  The policy — a contract between Terry and AXIS, with an attendant responsibility to "[c]ooperate with us in the investigation of a claim," (doc. 162-5 at 28) (emphasis added) — is silent as to Terry's obligation under the policy to cooperate in a criminal investigation.  Further, as stated above, the addendum to the police report creates a question of fact as to Terry's cooperation with the criminal investigation.

AXIS also occasionally points to Terry's allegedly bad behavior in this case to support she has not cooperated with it.  (*See, e.g.,* doc. 172 at 43-44).  Terry's discovery obligations in this case are governed by the Federal Rules of Civil Procedure, not the Policy.  Terry has already been sanctioned for her failure to produce documents to AXIS.  (*See* doc. 173).  AXIS's backdoor request the court grant it summary judgment for discovery violations is not well taken.

[24] AXIS cites *Shan Hsu* in its "Standard of Review" section.  (Doc. 172 at 35).

[25] AXIS contends Terry "admits that she has not cooperated," (doc. 180 at 10), but provides no citation for this admission.  In fact, Terry repeatedly states she has cooperated in the investigation.  (*See, e.g.,* doc. 165-1 at 102 (407:2-10)).  Nor would any admission by Terry discharge AXIS's burden to show materiality and prejudice.

As to Terry's failure to provide AXIS with the names of witnesses, AXIS's statement of undisputed facts indicates Terry has "refused to identify witnesses to AXIS Insurance Company's attorney," (doc. 172 at 32), and "refused to identify [a] third-party" who paid laborers at her house, (*id.* at 25). To support the first portion of this, AXIS cites the extreme end of Terry's first EUO, after Terry had informed AXIS's counsel that Ree Ree knew about Moore's threats because Taylor and Ree Ree's husband were "associates":

> Q.   What's his name, the boyfriend or the husband?
> A.   I don't know his name, his whole name, his real name.
> Q.   What's his street —
> A.   You will have to ask [Ree Ree] that. I'm not throwing any more names out there because it seems like that's what y'all trying to do. Y'all trying to get me killed.
> Q.   No, nobody is trying to get anybody killed. Don't — please don't — there's nobody up here today, nobody's looking, seeing this. This information will be given to your insurance carrier.

(Doc. 163-2 at 24 (196:2-21)). Immediately following this, AXIS's counsel concludes the EUO. (*Id.* at 24-25 (196:22-197:6)). While it is true Terry does not provide the husband's name, AXIS does not attempt to show prejudice from this (i.e., that it was unable to track down the husband because Terry insufficiently identified him). Nor does it offer anything to support the materiality of the husband's name, given that AXIS could presumably obtain testimony from Ree Ree (whose identity it does not contend Terry concealed) regarding the same facts. AXIS's counsel's decision to end the interview without following up on this matter suggests the missing name was neither material nor prejudicial to it. Terry did refuse to name the third party who helped her pay laborers at her house on the basis the third party "wish[es] not to be involved," (*see* doc. 164-1 at 7-8 (28:1-17)), but AXIS also offers no argument why failing to identify this third party was material or prejudicial. Therefore, it has not met its burden to demonstrate Terry's alleged failure to cooperate permits it to deny coverage.

AXIS's final salvo is that Terry has breached the concealment and fraud provision of the contract. As noted above, this provision states AXIS will not provide coverage to an insured who has "[i]ntentionally concealed or misrepresented any material fact or circumstance . . . [e]ngaged in fraudulent conduct . . . or [m]ade false statements." (Doc. 162-5 at 35-36). An Alabama statute overlays onto this provision the requirement that "[n]o misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made <u>with actual intent to deceive</u> as to a matter material to the insured's rights under the policy." ALA. CODE § 27–14–28 (emphasis added). *See also Howe v. Allstate Ins. Co.*, 2008 WL 559578, *1 (N.D. Ala. 2008) ("the language in Alabama Code § 27–14–28 is built into every casualty insurance policy issued in Alabama" and an insurer "cannot contract around it").

Even accepting AXIS's framing that Terry has breached this provision by concealing facts from its investigators and the police, (*see* doc. 172 at 43-44), the only arguments AXIS marshals to support Terry's intent to deceive rest on assumptions that her testimony is false or inconsistent with other evidence. Again, the court may not weigh the evidence to reach that conclusion, as AXIS requests. Accordingly, AXIS is not entitled to summary judgment on this theory either.

## V. Conclusion

For the reasons stated above, AXIS's motions for summary judgment, (docs. 160 & 172), are **DENIED**. A status conference is **SET** for **February 19, 2019 at 10:00 a.m.** in the chambers of the undersigned to discuss preparations for trial. A court reporter will be present.

DONE this 30th day of January, 2019.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE